# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL AND CHRISTINE MIKSIS, ON BEHALF OF JOHN MIKSIS, | ) ) ) | No. 12 C 8497 |
| PLAINTIFFS, | ) ) | Judge Thomas M. Durkin |
| v. | ) ) | |
| EVANSTON TOWNSHIP HIGH SCHOOL DISTRICT # 202, | ) ) ) | |
| DEFENDANT. | ) ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

By minute order dated September 30, 2016 (R. 81), the Court denied the parties' pending cross-motions for summary judgment (R. 49, 51), stating that a written opinion would follow. The Court now sets forth the reasons for its September 30, 2016 order.

## TABLE OF CONTENTS

BACKGROUND

    A.    Introduction

    B.    The First Lawsuit

    C.    Meetings To Establish John's Educational Program For Post-Senior Year And Subsequent Settlement Of The First Lawsuit

    D.    Post-Settlement Disputes

        1.    Orchard Academy Aides And Supports For John's Classes At Oakton Community College

        2.    Defendant's Termination Of Orchard Placement And Disenrollment From School For Nonattendance

        3.    PACE's Denial Of John's Application And His Enrollment In ELSA

  E.  The Present Lawsuit

DISCUSSION

I. Subject Matter Jurisdiction

  A.  Jurisdiction Based On Breach Of An Agreement To Settle A Federal Claim

  B.  Federal Question Jurisdiction Based On The IDEA

  C.  Federal Question Jurisdiction Based On An Embedded Issue Of Federal Law

  D.  Supplemental Jurisdiction

II. Summary Judgment

  A.  Standard of Review

  B.  State Law Breach Of Contract Claims

    1.  Whether Administrative Exhaustion Applies

    2.  Whether Defendant Breached The Settlement Agreement

      a.  Orchard Aides And Supports For Community College Classes

      b.  PACE/ELSA Program

        (i)  Anticipatory Breach Theory

        (ii)  Material Breach Doctrine

        (iii)  Supplying The Missing Contractual Term On Which The Parties Failed To Agree

  C.  Federal IDEA Claims

    1.  Whether Plaintiffs Were Required To Exhaust Their Administrative Remedies

      a.  Waiver

      b.  Futility Or Inadequacy Of Exhaustion

    2.  Whether Defendant Denied John A FAPE

  D.  Equitable Issues: Failure To Cooperate, Estoppel, and Unclean Hands

CONCLUSION

# BACKGROUND[1]

## A. INTRODUCTION

This case concerns the high school education of John Miksis. John is currently twenty-six years old, but, when the events at issue began, he was a twelve-year old child with Down Syndrome who was about to enter the ninth grade. Defendant Evanston Township High School District #202 is a public educational agency that receives federal funding. As such, Defendant is subject to federal education laws and regulations, including the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, as amended by the Individuals with Disabilities Education Improvement Act ("IDEIA"), P.L. 108–446, 118 Stat. 2647 (Dec. 3, 2004) (hereinafter ("the IDEA" or "the Act").[2]

The IDEA is a federal statutory scheme governing the education of disabled students like John, which seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C.

---

[1] The information in this section, which may include both disputed and undisputed facts, is drawn from allegations in the pleadings, discovery materials submitted by the parties, and documents that are part of the court record in *John M. ex rel. Christine M. v. Board of Education of Evanston Township High School District 202*, Case No. 05-cv-6720 (N.D. Ill., filed Nov. 28, 2005) (hereinafter cited as *John M.*, 05-cv-6720).

[2] As the Third Circuit explained in *Ballard ex. rel Ballard v. Philadelphia School District,* 273 Fed. App'x 184, 195 n.1 (3d Cir. 2008), the IDEA was renamed the IDEIA, effective July 1, 2005. But the parties continue to refer to the statute as the IDEA, and therefore the Court will do the same.

§ 1400(d)(1)(A). The term "free appropriate public education," or "FAPE," is defined in the Act as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of [the Act]." 20 U.S.C. § 1401(9).

### B. THE FIRST LAWSUIT

In the spring of 2004, John's parents, Michael and Christine Miksis, were in discussions with Defendant about the individualized education program, or "IEP,"[3] for John's up-coming freshman year at Evanston Township High School ("ETHS"). The parties were unable to agree about what John's IEP should include. Therefore, John's parents filed an administrative complaint and requested an impartial due process hearing to resolve the issue.[4] The hearing was held over the course of

---

[3] An IEP is "a written statement that maps out how a school district will provide an IDEA-compliant education" for that student. *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. # 221*, 375 F.3d 603, 606 (7th Cir. 2004). It is developed by a team composed of the student's parents, teachers, and other school district representatives, 20 U.S.C. § 1414(d)(1)(B), and includes, among other things, the "special education and related services," "supplementary aids and services," and "program modifications or supports for school personnel that will be provided" to the disabled student by the school district, *id.,* § 1414(d)(1)(A)(i)(1)(IV).

[4] In addition to ensuring that disabled students are provided a FAPE, the IDEA also seeks "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B). This goal is achieved by requiring state and local educational agencies to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." *Id.,* § 1415(a). Among the required procedural safeguards is the

several days in the fall of 2004. At the conclusion of the hearing, the hearing officer issued a written decision finding against John and his parents. Dissatisfied with that result, John's parents exercised their right to appeal the hearing officer's decision to a federal court in this district.[5] John's parents' lawsuit was assigned to Judge Holderman (05-cv-6720), who, shortly after the case was filed, issued an order granting Plaintiffs a preliminary injunction to require Defendant to provide on a temporary basis while the case was being litigated the educational supports and services that John's parents believed were necessary to comply with the IDEA. *See John M. ex rel. Christine M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. 202*, 450 F. Supp. 2d 880 (N.D. Ill. Aug. 18, 2006).[6] Defendant, however, filed an interlocutory appeal from Judge Holderman's preliminary injunction order, and

---

opportunity to lodge a formal complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," *id.*, § 1415(b)(6)(A), as well as to participate in an "impartial due process hearing," *id.*, § 1415(f)(1)(A), before an independent hearing officer who is an expert in special education laws and issues, *id.,* § 1415(f)(3)(A).

[5] *See* 20 U.S.C. § 1415(i)(2)(A), (3)(A) (providing that "[a]ny party aggrieved" by a final decision of a state educational agency may bring a civil action in state or federal court appealing that decision).

[6] Judge Holderman's preliminary injunction order was based on the "stay-put" provision of the Act, which mandates that, during the pendency of any due process proceedings, the child is to remain in his or her "then-current educational placement." 20 U.S.C. § 1415(j). Judge Holderman found that John's "then-current educational placement" was John's most recent IEP, which was the IEP established by John's elementary school district for John's eighth grade school year. *See Drinker ex. rel Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996) ("then-current educational placement" typically means the child's most recent educational placement). The special educational services and supports set out in John's eighth grade IEP were the same ones that John's parents had sought but were denied in the due process hearing from which they had appealed.

ultimately was successful in getting that order reversed for further consideration. *See John M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. 202*, 502 F.3d 708 (7th Cir. 2007). The Seventh Circuit issued a ruling in favor of Defendant on September 17, 2007, and a mandate remanding the case to Judge Holderman for further proceedings on October 9, 2007.

By the time the Seventh Circuit remanded the lawsuit to the district court, John was in his third year of high school. Thereafter, another year passed while the parties attempted to settle the case. In the fall of John's senior year, Defendant filed a motion to dismiss the federal lawsuit, arguing that, because John was about to finish his senior year, the lawsuit was moot. John's parents contested that motion, arguing that the case was not moot because John's rights under the IDEA did not terminate with the end of his senior year of high school. Instead, John was entitled to special educational services from Defendant until he graduated, or through the day before he turned twenty-two, whichever came first. *See* 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). As all parties to the lawsuit conceded, John would not actually be graduating at the end of his senior year of high school. John's parents argued that, because Defendant would still be required to provide John with educational services beyond his senior year of high school,[7] the substantive issues in the lawsuit regarding the special educational services and aides to which John was entitled were not moot. *See John M.*, 05-cv-6720, Dkt. # 98 at 9.

---

[7] John turned 22 years old on October 15, 2012, and thus his IDEA eligibility expired at the end of the day on October 14, 2012. *See* R. 61 at 22 (Def. Add'l SOF, ¶ 2) (admitting that John was eligible for special education under the IDEA until October 14, 2012).

In a ruling issued on March 16, 2009, Judge Holderman rejected Plaintiffs' arguments that the underlying merits issues about the educational services to which John was entitled presented a live controversy. According to Judge Holderman, the question of what educational services John was entitled to during his first four years of high school was different than the same question asked about John's IDEA-eligible years after his senior year of high school. The federal lawsuit filed by John's parents, Judge Holderman concluded, dealt only with the former question, which all parties agreed no longer needed to be decided:

> Plaintiffs do not articulate how or why John's transition program[8] should be considered analogous to John's academic program. It appears to the court that these programs are distinct, as there is no indication that either party intends the transition program to include enrollment within the general curriculum. The fact that Evanston School District will be providing these services

---

[8] Judge Holderman adopted the parties' use of the term "transition program" to refer to the educational services Defendant would be providing John in the time period between the end of John's senior year of high school and the end of his IDEA eligibility. But the word "transition" as used in the Act does not refer to a specific period of time in which a distinct educational program is to be delivered to a student. Instead, it refers to a category of special educational services the IDEA requires the school district to provide as part of a child's IEP "beginning no later than the one that will be in effect when the child is 16 years old." *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 275-76 (7th Cir. 2007) (IEP must "include 'appropriate measurable postsecondary goals based on age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills,'" and must "describe the 'transition services (including courses of study) needed to assist the child in reaching those goals'") (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb)). Illinois has extended this requirement so that transition services must be provided beginning no later than the school year in which the child turns 14 years old. *See* 105 ILCS 5/14-8.03(a-5); 3 Ill. Adm. Code 226.230(c). Thus, according to state and federal law, "transition services" should have been provided to John throughout his secondary school education, including his first four years of high school.

> is not enough by itself to demonstrate that John's past
> IEPs remain relevant at this point in John's education.

*John M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. 202*, 2009 WL 691276, at

*4 (N.D. Ill. Mar. 16, 2009) (footnote omitted). Nevertheless, Judge Holderman

agreed with Plaintiffs' additional arguments that the first lawsuit was not entirely

moot, because, in addition to seeking a change in Defendant's proposed IEP for

John, Plaintiffs also were seeking compensatory education[9] for Defendant's past

violations of the "stay-put" IEP[10] and their attorneys' fees.[11] Plaintiffs' claims to

recover both of these items of damages, Judge Holderman held, were still viable. *Id.*

at *5-6.

### C. MEETINGS TO ESTABLISH JOHN'S EDUCATIONAL PROGRAM FOR POST-SENIOR YEAR AND SUBSEQUENT SETTLEMENT OF THE FIRST LAWSUIT

Around the time the parties were addressing the mootness issue in the first

lawsuit, they also were meeting outside the litigation to discuss John's placement

after the end of his senior year and during the final years of his IDEA eligibility.

These discussions occurred during two meetings in the spring of 2009. The first

---

[9] Compensatory education "is a judicially created equitable remedy available to compensate for a past denial of a free appropriate public education." *Foster v. Bd. of Educ. of City of Chi.*, 611 Fed. App'x 874, 878 (7th Cir. 2015) (unpublished) (internal quotation marks and citation omitted).

[10] *See* footnote 6.

[11] The IDEA has a fee-shifting provision, which provides that, "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B); *see Linda T. v. Rice Lake Area Sch. Dist.*, 417 F.3d 704, 707 (7th Cir. 2005).

meeting took place on March 27, and the second meeting took place on May 15. In both instances, the meeting was led by Bob Gottlieb, who at the time was Defendant's Director of Special Education. Believing they had reached an agreement regarding John's educational placement during these meetings, the parties subsequently entered into a settlement of the first lawsuit. The Settlement Agreement provided that Plaintiffs would release Defendant from their claims in the lawsuit, and, in return, Defendant agreed to provide certain special educational services during John's first post-senior year of IDEA-eligibility (2009-2010 academic year) as follows:

> 1.      As discussed during John's Individual Education Plan ("IEP") meeting held by the parties on May 15, 2009, the parties agree that John will attend Orchard Academy . . . in its intensive individualized transition program beginning August 25, 2009 at the District's expense. The parties further agree that Orchard Academy will make its own individualized assessments of John's educational, psychological, physical and life skills in order to recommend to the IEP team what John's educational goals are and to recommend to the IEP team the services, aids and therapies that John will require to accomplish those goals and move toward independent living. During the period of Orchard Academy's individual assessment of John, John will receive those aid[e]s, including but not limited to speech and occupational therapy, at the same level he received during the 2008-2009 school year (with the exception of Adapted Physical Education, which will not be provided). Within 30 days after Orchard Academy completes its assessment, the parties will meet in an IEP meeting to confirm that the assessment and educational and other goals established by Orchard Academy are consistent with John's transition goals discussed in the parties' May 15, 2009 IEP meeting and to finalize John's IEP for 2009-2010.

R. 49-3 at 2 (Settlement Agreement, ¶ 1). The Agreement goes on to address John's final IDEA-eligible secondary school years (2010-2011 academic year; 2011-2012 academic year through October 14, 2012) as follows:

> 2.      Beginning in the Fall of 2010, it is the parties' intent that John will be enrolled in the transition education program at the Professional Assistance Center for Education, referred to as the PACE program at National Louis University (the "PACE program"), . . . at the District's expense, with John continuing in the PACE program through the day before his 22nd birthday; however, it is agreed that John's enrollment in the PACE program is contingent upon the PACE program's acceptance of John into its program. If John is not accepted into the PACE program, if he is terminated from the PACE program, or if the PACE program is terminated, the parties agree to meet to discuss and consider other appropriate placement options for John's post-secondary transition education. However, all other provisions of this Agreement shall remain in effect regardless of John's acceptance, non-acceptance or termination from or of the Orchard Academy or PACE programs.

*Id.* at 7-8 (Settlement Agreement, ¶ 2).

The Agreement concludes with an acknowledgement that it "is a release and settlement of disputed claims, as provided for herein[ ] . . . entered into solely as and for a compromise settlement of such disputed claims." *Id.* at 5 (Settlement Agreement, ¶ 9). It was signed on July 11, 2009 by each of John's parents and by John, and on July 17, 2009 by Eric Witherspoon, Superintendent of Evanston Township High School District #202. *Id.*

### D.    POST-SETTLEMENT DISPUTES

On July 1, 2009, Maria Smith replaced Gottlieb as Defendant's Director of Special Education. R. 52-5 at 2 (Smith Declaration). Smith did not participate in

either of the two meetings held in the spring of 2009 or in the negotiation or execution of the Settlement Agreement. *See* R. 49-7 at 18-21 (Smith Deposition). Shortly after Smith took over and at the beginning of John's first post-senior secondary school year, disputes arose over the nature and scope of the educational support and services to which Defendant had agreed.

### 1. ORCHARD ACADEMY AIDES AND SUPPORTS FOR JOHN'S CLASSES AT OAKTON COMMUNITY COLLEGE

The first dispute centered on John's enrollment in classes at Oakton Community College. John began his placement at Orchard Academy on August 31, 2009. A few weeks prior to that date, Christine Miksis had emailed Tim Bobrowski, Director of Orchard Academy, indicating that a settlement had been reached in the lawsuit and that she had enrolled John in classes at Oakton.[12] From approximately August 31 through September 9, John attended Orchard Academy and the

---

[12] The email appears to have been sent for purposes of touching base with Orchard in anticipation of John's upcoming start in that program beginning on August 31, 2009. It states in pertinent part as follows:

> I don't know if you have been contacted, but I wanted to let you know that a settlement agreement was signed in mid-July and was approved by the judge on July 23. I have been making class arrangements at Oakton. I don't have a printout of the class schedule yet . . . . Attached is the stay-put IEP (the IEP that was used through HS). . . . I know that your program starts August 25, but . . . [w]e will return on Aug 30; ETHS starts on Aug 31. I believe my husband tried to get John's transcript and ACT scores forwarded to OA. I am not sure if you have received it yet. Please let me know if there is anything else I need to send you.

R. 52-6 at 12.

community college classes in which his parents had enrolled him. Orchard provided John with transportation to and from his classes and a one-on-one aide to support them. Moreover, a special education assistant at Orchard, Sarissa Hahn, sent John's parents an email with an attached document titled "Orchard Academy Responsibilities with regard to John Miksis attending Oakton Community College." R. 49-5.[13] The stated purpose of the document was "to provide] a clear set of our expectations for John, your family, and ourselves[ ] . . . to be sure we are all on the same page in terms of supports for John." *Id.* at 1. The document states, among other things, that Orchard staff would "provide supports to John to access his classroom at Oakton College," would "attend class, if professor allows," and would "assist John to access approximately 4 hours of tutoring support at Oakton." *Id.* at 2.

On or about September 9, 2009, Smith had a telephone conversation with Bobrowski regarding John's program at Orchard. It was then that she first learned John had been attending community college classes since the start of the school year and Orchard had been providing aides and supports for those classes. According to Bobrowski, Smith notified him "that John's attendance at Oakton was a unilateral action by John's parents, that the District had not agreed to and did not authorize Orchard to provide services and transportation related to Oakton courses,

---

[13] Defendant states that the Hahn email and attached document have not been authenticated. Because the email was sent to Christine Miksis, she will likely be able to provide the proper foundation for its admission at trial. *See generally U.S. Equal Emp't Opportunity Comm'n v. Olsten Staffing Servs. Corp.*, 657 F. Supp. 2d 1029, 1034 (W.D. Wis. 2009). Therefore, the Court can consider the email at this stage of the proceedings. *See* footnote 42.

and that Orchard should cease providing such services and transportation to John." R. 52-4 at 8 (Bobrowski Decl. ¶ 29). "Based on Dr. Smith's direction, on or around September 9, 2009, Orchard discontinued providing John services related to his attendance at courses at Oakton." *Id.* (Bobrowski Decl. ¶ 30). Also on September 9, Smith spoke with Christine Miksis by telephone. After the call, Christine wrote Smith an email stating the following:

> I am sorry you are so upset. Clearly, you were not provided with complete information.
>
> There were many people at the meeting on May 15, 2009. There was no IEP written.
>
> John's goals for his future were presented at a meeting in March where several placement options were discussed. Orchard Academy did not come to that meeting; their representatives did attend the May meeting. The decisions made at the May meeting determined what was written in the settlement agreement. The settlement agreement clearly states that John's 2008-2009 program remains in effect until after Orchard Academy completes its assessment and an IEP meeting is held to write up a transition IEP. No one tried to pull anything over on anyone and I am sorry you feel that way.
>
> I also do not understand why you are so adamantly opposed to John taking classes at Oakton; you have many students from ETHS who are taking classes there . . . and some receive many more services than John. The Orchard Academy representative brought up the issue of the aide and your own attorney agreed that this service would be continued, with a gradual taper.
>
> The program was clearly described by the Orchard Academy representative and it is partly described on their website (http://ww.orchardacademy.org/curriculum/). This is the individualized program.

Again, this was all decided in front of many people. (The program that was included in John's file may have come from another publication and I believe that program is their "standard" program).

I am sorry to hear that you have already decided what program is appropriate for John without ever having met him or us. However, we have paid for John to take the classes at Oakton and you cannot bar him from taking classes there. He will continue his classes as he is entitled to continue his education like any other student. The classes are necessary for him to meet his vocational and independence goals. At this time it is probably best to leave all further discussions to the attorneys as it seems that we are clearly at an impasse. I have informed Orchard Academy that we will continue sending John to his classes at Oakton. If you do not authorize them to continue the program as agreed to in the settlement plan, we cannot send John there until there is a definitive resolution. This will hold up the completion of the assessments.

R. 49-8 at 1.

That same day, Defendant's attorney, Patricia Whitten, sent Plaintiffs' then-attorney, Michael Graham, a letter setting forth Defendant's position regarding the community college issue:

Mrs. Miksis informed OA [Orchard Academy] that John would be attending these classes shortly before John began attending the program at OA. She told them that the District was aware of this and that they must provide transportation and support in accordance with the "stay put" IEP from 8th grade, which she said was still in effect. As you and I have already agreed, said IEP is no longer in effect. Due to your client's misrepresentations to OA staff, OA mistakenly began providing transportation and a 1:1 aide for John for two Oakton classes which started last week (John's first week attending the OA program). . . . The settlement agreement between the parties does not contain any agreement regarding John's attendance at courses at Oakton Community College, nor does the

current transition program IEP provide for this. No one on the IEP team other than the parents thought that it would be appropriate for John to take courses at Oakton at this point . . . and you stated at the March 27, 2009 IEP meeting that the parents had decided that attending Oakton was not appropriate for John at this time. The parents unilaterally registered John at Oakton without consulting anyone from the District or OA, which we feel is an attempt to usurp the OA transition program. OA's completion of John's assessments has been delayed due to his attendance at Oakton and resulting unavailability.

R. 52-6 at 14.

Thereafter, it appears the parties reached a truce of sorts, with John's parents providing transportation and tutoring for John's community college classes at their own expense while John also continued to participate in Orchard's program when he was not attending academic classes at the community college. John's parents sought to preserve their rights under the IDEA and the Settlement Agreement by sending Smith a letter, stating, among other things, that they "may seek reimbursement" for the costs they incur to provide the aides and supports terminated by Smith.[14] Meanwhile, Smith tolerated John's attendance at Oakton classes and consequent absences from the Orchard program in deference to his parents' preferences.[15] In addition, the parties continued to meet and communicate

---

[14] *See* R. 52-6 at 4 (September 18, 2009 letter from Christine Miksis) ("Until such time as John's entire program is reinstated, we will provide at our own expense the portion of John's educational program that you discontinued so that his education is not interrupted and his progress is not impeded. This includes all of the associated support services that are listed in his program from last year and that had previously been provided by Orchard Academy. We may seek reimbursement for all costs we incur because this placement is necessary to provide John with a FAPE.").

[15] *See* R. 49-7 at 41-42 (Smith Deposition) ("**Q:** When you say there was an understanding that the parents did not want [John] there full-time and you

with each other over Orchard's on-going assessments of John and proposed adjustments to be made to his 2009-2010 IEP based on those assessments, as both parties acknowledged had been agreed upon at the May 15, 2009 meeting.

**2. DEFENDANT'S TERMINATION OF ORCHARD PLACEMENT AND DISENROLLMENT FROM SCHOOL FOR NONATTENDANCE**

In the early part of 2010, John's attendance at Orchard declined even further and Smith apparently came to the decision that this was not acceptable. Rather than call a meeting to communicate her decision and discuss whether mutual resolution of the problem was possible, Smith sent John's parents a letter. The letter was sent by regular mail on or about March 5, 2010, and stated that John's placement at Orchard would be terminated effective March 15 based on his nonattendance:

> [S]ince the meeting [on January 15], John's attendance at the Orchard Academy program has declined even more, and as you know this semester he is attending only once a week, on Fridays. . . . . Under these circumstances, you are preventing District 202 from providing a transition program to John this year, and the District has no choice but to terminate the placement based on your non-cooperation. Clearly John is not able to gain benefit from this or any program by attending once a week. Please be advised that John's program at Orchard Academy will end at the end of the day on March 15, 2010. The enclosed IEP, developed over three IEP meetings, is being offered to John based on his full time attendance in a transition program. If you choose to accept the placement at Orchard Academy and want to send John to the program full-time, please contact me, and I will then reinstate his program

respected that, do you mean there was an understanding that Mr. and Mrs. Miksis wanted John to attend classes at Oakton College instead of at times when he should have been at the Orchard Academy placement? **A.** Yes. I think so, yes.").

16

> at OA. If you prefer, we could have another IEP meeting
> as soon as possible to review the program and facility
> options yet again. Please let me or your attorney know
> how you wish to proceed. In any event, we should
> schedule a meeting in the near future to discuss John's
> placement for 2010-11 pursuant to the settlement
> agreement.

R. 52-6 at 19.

An identical letter also was sent by Whitten to Plaintiffs' new attorney, Stephen Glick. *See* R. 52-6 at 22. Glick responded to a telephone voice message conveying the same information, apparently left by another of Defendant's attorneys (John Relias), with an email dated March 15, 2010 (the effective date of John's termination per the March 5 letter):

> John:
>
> I received your voice message (left Friday) today[ ] . . .
> that the district is going to terminate John's current
> placement because he is not attending except on Friday
> and that the district does not want to continue to pay for a
> placement that is not being used. My position on that is
> that this would be an illegal act. Under the law, the
> district is obligated to offer a FAPE. This placement is in
> place via a written settlement agreement. I am not aware
> of any authority, either via the settlement agreement or
> via federal law that authorizes the district to unilaterally
> terminate this placement (or any placement) without a
> properly noticed IEP meeting. Also, I think this needs to
> be discussed/considered by the IEP team. I am certain
> that Patti [Whitten] has informed you that my clients do
> not believe that OA [Orchard Academy] is appropriate for
> their son. To that end, I will talk to my clients. However, I
> think we need to discuss other options for John.

R. 52-6 at 26.

The record does not contain any information about further communication that might have taken place between the parties or their representatives after the

March 15, 2010 email message from Glick to Relias.[16] Moreover, although Smith's March 5, 2010 letter only references terminating John's placement at Orchard Academy, it is undisputed that, on March 15, 2010, Defendant also terminated John's enrollment in the school district. R. 61 at 22 (Def. Add'l SOF, ¶ 1) ("John was a student at ETHS until March 15, 2009, when John's placement was terminated for non-attendance and his parent's non-cooperation, *and he was disenrolled as a student of ETHS.*") (emphasis added). Despite the fact that both Smith's March 5 letter and Glick's March 15 email expressed the need to have further discussions, no meeting was ever held. Smith and Christine Miksis both testified that they did not pursue a meeting with each other because, among other things, John by then had been disenrolled from the school district.

### 3    PACE'S DENIAL OF JOHN'S APPLICATION AND HIS ENROLLMENT IN ELSA

Per the Settlement Agreement, John applied to attend the PACE program sometime in October 2009. R. 52 at 19 (Def. SOF, ¶ 71). PACE denied John's application for admission on or about February 20, 2010, approximately three weeks before John was disenrolled from the school district. Plaintiffs allege that Defendant played a role in PACE's rejection of John's application. Defendant denies that allegation.[17]

---

[16] Although the parties do not mention any further communications, it seems unlikely that Defendant's attorney did not at least respond to Plaintiffs' email.

[17] There is only indirect evidence to support Plaintiffs' allegation, consisting of Christine Miksis's testimony about timing and things that were said to her during her interactions with PACE personnel. *See* R. 49-4 at 98-101. In addition, there is evidence of a possible motive for Defendant to have interfered with John's PACE

John's parents did not notify Smith about PACE's denial of John's application, but Smith admitted she learned about it at some point after John's enrollment in the school district had terminated on March 15, 2010. R. 49-7 at 62. Smith testified that she did not call a meeting to discuss alternative placements after she learned about PACE's rejection of John's application because she "hadn't even been notified that he had applied." R. 49-7 at 62. She also did not call a meeting because, by the time she learned that John's application had been denied, he was already disenrolled from the school district and she believed Defendant had no further obligations to him going forward unless and until he sought reenrollment. *Id.* at 63-66. Christine Miksis testified that she did not personally contact Defendant to discuss alternative placements after learning about PACE's rejection of John's application for a number of reasons. First, she testified that she already had discussed alternative placements with Smith after Smith informed her at meetings that took place before she learned of PACE's rejection of John's

application. Smith testified that she first heard of the PACE program when she reviewed the Settlement Agreement shortly after taking over as Director of Special Education. Because she was not familiar with it, she did some investigation and learned that it was not a state-approved program. R. 49-7 at 67. She therefore contacted the program and was told by a representative that PACE "didn't want to be on the approved list." *Id.* Of course, Defendant already had committed in the Settlement Agreement to fund John's placement at PACE without regard to its status as a state-approved program. Christine Miksis testified that Smith and Whitten told Plaintiffs at several meetings in December 2009 and early January 2010 that the school district was "not willing to pay for PACE, even if [John] was accepted." R. 49-4 at 102. Christine testified that she was tired of fighting with the school district, and therefore was willing to consider another program. She testified that she asked Smith and Whitten on more than one occasion to suggest an alternative program, but the only program they named was one at Orchard Academy. Christine testified that the suggested Orchard program was not a residential program and was not otherwise comparable to PACE. *Id.*

application that Defendant would no longer support a PACE placement, and those discussions had gone nowhere (*see* footnote 17). Second, Christine testified that Smith terminated John's enrollment in the school district around the same time as Christine learned of PACE's rejection, and, once that happened there was no point in asking for a meeting. And third, Christine testified that Smith had essentially cut off communication with Plaintiffs in this time period, as shown by the fact that she refused to take a call from Christine about an injury John had received at Orchard on the same day as Plaintiffs received the notice about PACE's rejection. *See* R. 49-4 at 104-14. In addition, Christine testified that her attorney's statement in his March 15 email that "we need to discuss other options" was the equivalent of a request for a meeting to which Defendant never responded.

In May 2010, John's parents applied for John to attend the Elmhurst Learning and Success Academy ("ELSA"), believing that program (although apparently not a residential program like PACE) was the most comparable program to PACE in the area. Christine testified that her attorney informed Defendant's attorney about John's application to ELSA. R. 49-4 at 115. Smith denies receiving the information, however. John was accepted by ELSA and was still attending that program at the time this lawsuit was filed. Smith testified that she did not learn of John's attendance at ELSA until around the time Defendant was contacted by Plaintiffs' attorney seeking reimbursement for the program just prior to the filing of this lawsuit.

## E.   THE PRESENT LAWSUIT

On October 9, 2012, Plaintiffs filed a "Complaint for Breach of Contract" against Defendant in the Circuit Court of Cook County, Illinois. The complaint alleges that, in September 2009, Defendant made a number of "placement/transition planning decisions," which "did not comply with either the express terms" of the Settlement Agreement or the "transition plan" the parties had agreed to in the meetings held in the spring of 2009. R. 1-1 at 3. The complaint also alleges that Plaintiffs "sought assistance" from Defendant for an alternative program to PACE, but that Defendant "refused to find an appropriate program" and then "refused to support" John's placement in the ELSA program. *Id.* at 4. According to the complaint, John's parents "have sustained financial loss as a result of the defendant's breach of the [S]ettlement [A]greement" in that "[t]hey have paid for tuition at OCC [Oakton Community College] and ELSA," "[t]hey have had to pay for and/or provide transportation," and "[t]hey have had to pay for other reimbursable expenses." *Id.* Accordingly, the complaint seeks "to enforce breach of [the] [S]ettlement [A]greement[ ] under the IDEA" by permitting Plaintiffs to recover for their out-of-pocket losses, as well as reasonable attorneys' fees and costs as provided for in the Act. *Id.* at 4-5.

Defendant responded to the state court complaint by removing it to federal court, arguing that Plaintiffs' breach of contract claims implicated rights under the IDEA for which federal jurisdiction was proper. Upon its removal, the case was originally assigned to Judge Guzman, who referred it to a magistrate judge for

possible settlement. Settlement was unsuccessful, and, on January 14, 2013, the case was reassigned to the undersigned judge. Upon reassignment, the Court immediately raised the question of the propriety of the removal. Defendant filed a brief in support of removal jurisdiction, arguing that Plaintiffs' claim for breach of contract arose under federal law because of "the interrelationship between the Settlement Agreement and the IDEA." R. 26 at 2. Defendant further argued that federal question jurisdiction existed because, in order to determine whether Plaintiffs are entitled to the relief they seek, the Court must interpret and apply principles from the IDEA. *Id.* at 3. Plaintiffs declined to file a written response to Defendant's jurisdictional arguments, stating orally on the record that they did not oppose Defendant's removal petition. Relying on the arguments and citations to authority in Defendant's removal brief, the Court found it had subject matter jurisdiction, R. 27, and the case proceeded to discovery. More than a year later, the parties filed cross-motions for summary judgment.

## DISCUSSION

Plaintiffs' motion for summary judgment argues that the evidence is undisputed that Defendant breached the terms of the Settlement Agreement and John's agreed-to transition plan, first, by terminating the aides and supports John had been receiving from Orchard Academy, which allowed him to take academic classes at Oakton Community College, and, second, by terminating his placement in Orchard and his enrollment in the school district, and by refusing to pay for his placement in the ELSA program. Defendant's cross-motion for summary judgment

argues that Plaintiffs' claims should be denied as a matter of law, first, because Plaintiffs failed to comply with the IDEA's requirement for exhaustion of administrative remedies, and second, because John's parents failed to cooperate with Defendant's efforts to provide John with a FAPE. The Court addresses these summary judgment issues below, but, before doing so, the Court first must reexamine the basis for federal jurisdiction over this dispute.

## I.  SUBJECT MATTER JURISDICTION

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). Although the parties do not contest the Court's exercise of subject matter jurisdiction over Plaintiffs' claims, "neither the parties nor their lawyers may stipulate to jurisdiction or waive arguments that the court lacks jurisdiction." *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir. 2000); *see DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 740 (7th Cir. 2009) ("Subject-matter jurisdiction is not an issue that can be brushed aside or satisfied by agreement between the litigants."); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) ("jurisdiction cannot be conferred by consent of the parties") (internal quotation marks and citation omitted).

The parties' summary judgment arguments caused the Court renewed concerns about the basis for its jurisdiction over this matter. Therefore, the Court had an independent duty to look into the question. If in reexamining the

jurisdictional question the Court were to determine that subject matter jurisdiction

is lacking, the case would have to be remanded to state court. *See* 28 U.S.C. § 1447(c)

("If at any time before final judgment it appears that the district court lacks subject

matter jurisdiction, the case shall be remanded."). A remand would be required even

if it would impose a hardship on the parties. *See Hartland Lakeside Joint No. 3 Sch.*

*Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1036 (7th Cir. 2014) ("If this case is returned

to state court, it must start a new . . . and more than two years will have been lost.

But practical considerations never justify a federal court's adjudication of a suit over

which it lacks subject-matter jurisdiction.").

Defendant cites to "28 U.S.C. § 1400 *et seq.*,"[18] as the basis for this Court's

jurisdiction. Since the statutory reference accords federal jurisdiction over copyright

and patent cases, the Court presumes Defendant intended to cite to the IDEA,

which is *20* U.S.C. § 1400 *et seq.* While the facts presented in the complaint appear

to give rise to a potential claim that Defendant's actions denied John a FAPE and

thus violated the IDEA, the question is whether Plaintiffs have sought to recover on

that claim. Their complaint is titled "Complaint for Breach of Contract" and appears

to rest on alleged breaches of the Settlement Agreement. Moreover, in their

summary judgment briefing, Plaintiffs also at times appear to maintain that the

only claim they are asserting is for breach of the Settlement Agreement. *See, e.g.,*

R. 49 at 2 ("This is a very simple case involving a breach of [the] [settlement]

agreement by the defendant."); *see also* R. 49 at 6; R. 72 at 14.

---

[18] *See* R. 52 at 2 (Def. SOF, ¶ 6).

## A. JURISDICTION BASED ON BREACH OF AN AGREEMENT TO SETTLE A FEDERAL CLAIM

If the only claim Plaintiffs are making is for breach of the Settlement Agreement, the Court would not have subject matter jurisdiction. A settlement agreement is a type of contract, and it is well established that a claim for breach of contract generally does not give rise to federal question jurisdiction even if part of the consideration for the agreement is dismissal of an earlier federal suit alleging claims arising under federal law. *See Kokkonen*, 511 U.S. at 382 ("enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction"); *McCall-Bey v. Franzen*, 777 F.2d 1178, 1189-90 (7th Cir. 1985) ("there is no inherent federal jurisdiction to enforce agreements to settle federal suits"). There is an exception for when jurisdiction is preserved in the original lawsuit by the district court either "incorporat[ing] the agreement's terms into the dismissal order or expressly retain[ing] jurisdiction over the agreement." *T St. Dev., LLC v. Dereje & Dereje,* 586 F.3d 6, 11 (D.C. Cir. 2009); *see generally Jones v. Ass'n of Flight Attendants-CWA,* 778 F.3d 571, 573 (7th Cir. 2015); *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 636 (6th Cir. 2001). But Judge Holderman did neither of those things when he dismissed the first lawsuit. *See John M.*, 05-CV-6720, Dkt. # 108. [19]

---

[19] An example in the IDEA context where the terms of the settlement agreement had been made part of the order of dismissal is *Fortes-Cortes v. Garcia-Padilla,* 128 F. Supp. 3d 458, 466 (D.P.R. 2015), wherein the court held that it had jurisdiction to entertain a claim for violation of the agreement.

## B.     FEDERAL QUESTION JURISDICTION BASED ON THE IDEA

Plaintiffs contend that, notwithstanding the principles discussed above, the IDEA confers federal court jurisdiction to enforce settlement agreements resolving an IDEA claim. Plaintiffs rely on two provisions of the IDEA, one that applies to enforcement of settlement agreements reached during the IDEA-prescribed mediation process, and one that applies to enforcement of settlement agreements reached during the IDEA-mandated "resolution" process.[20] These statutory provisions, however, provide for jurisdiction to *enforce* settlement agreements, and Plaintiffs do not seek enforcement; they seek damages for breach of the Settlement Agreement. *See Lara v. Lynwood Unified Sch. Dist.*, 2009 WL 2366454, at *3 n.4 (C.D. Cal. July 29, 2009) ("IDEA's jurisdictional grant applies to 'enforcement' not 'breach' of settlement agreements"). Moreover, even if "enforcement" of a settlement agreement includes damages for past violations of the agreement, *see Kokkonen,* 511 U.S. at 378 (referring to "[e]nforcement of [a] settlement agreement . . . whether through award of damages or decree of specific performance"), several courts have recognized that, according to its plain language, these statutory provisions confer jurisdiction on federal district courts only to enforce settlement agreements that are

---

[20] *See* 20 U.S.C. § 1415(e)(2)(F) ("In the case that resolution is reached to resolve the [due process] complaint through the mediation process, the parties shall execute a legally binding agreement that sets forth such resolution and that . . . is enforceable in any State court of competent jurisdiction or in a district court of the United States."); 20 U.S.C. § 1415(f)(l)(B)(i) and (iii) ("Prior to the opportunity for an impartial due process hearing under subparagraph (A), the local educational agency shall convene a meeting with the parents . . . In the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement that is . . . enforceable in any State court of competent jurisdiction or in a district court of the United States.").

made in the IDEA mediation or resolution sessions. *See S.T. v. Jersey City Bd. of Educ.*, 2016 WL 4941993 (D.N.J. Sept. 14, 2016); *L.M. v. Lower Merion Sch. Dist.*, 2011 WL 71442, \*3 (E.D. Pa. Jan. 7, 2011) (citing cases); *see also H.C. ex rel. L.C. v. Colton-Pierrepont Cent. Sch. Dist.*, 341 Fed. App'x 687, 690-91 (2d Cir. 2009) (remanding to the district court to determine the existence of subject matter jurisdiction where it did not appear that the settlement agreement had been entered into as part of either a mediation or resolution session).

The Settlement Agreement in this case was not reached by means of either a mediation or a resolution session, as defined under the IDEA.[21] Defendant acknowledged as much in its jurisdictional brief filed when the case was first transferred to this Court. *See* R. 26 at 2 n.1. Nevertheless, Defendant argued in court that even though these provisions are not directly applicable to this case, it could be inferred from them that Congress intended federal court jurisdiction to exist for purposes of enforcing other types of IDEA settlement agreements. The Court did not address that argument at the time, but will do so now.

The Court must "begin with the fundamental principle that federal courts are courts of limited jurisdiction," and, therefore, jurisdictional statutes cannot be

---

[21] The mediation and resolution sessions referenced in the IDEA take place at the administrative level and are accompanied by specific procedural requirements. For example, where parties opt for mediation, they must meet with "a qualified and impartial mediator who is trained in effective mediation techniques." 20 U.S.C. § 1415(e)(2)(A)(iii). Conversely, if parties to an IDEA complaint chose the resolution session, the parties must, among other requirements, meet "within 15 days of receiving notice of the parents' complaint." 20 U.S.C. § 1415(f)(l)(B)(i)(I). Thus, even if the Settlement Agreement was entered into as a result of a mediation or settlement conference held in the first lawsuit (and there is no indication that it was), it still would not fall under the two specific provisions in question.

construed "any broader than their language will bear." *In re Application of Cnty. Collector of Cnty. of Winnebago, Ill.,* 96 F.3d 890, 895 (7th Cir. 1996). The Court agrees with Defendant that there is no apparent justification for allowing federal court enforcement of IDEA settlement agreements entered into as part of either the administrative mediation or resolution processes but not other IDEA settlement agreements. But the Court is unable to find any authority to support the view that it can assert federal jurisdiction based on an implied statutory jurisdiction-conferring provision.[22]

As one court explained, while the exercise of jurisdiction over other types of settlement agreements in IDEA cases might be "a logical extension" of the IDEA jurisdictional provisions, "it is not the role of the courts to append new provisions to

---

[22] There is some support for finding an implied jurisdictional provision based on a line of cases addressing federal jurisdiction to enforce EEOC conciliation and pre-determination agreements under Title VII. In those cases, courts (including the Seventh Circuit) have concluded that, even though Title VII does not explicitly provide the EEOC with authority to seek enforcement of conciliation or pre-determination agreements in federal court, it would undermine Congress' commitment to the conciliation and settlement processes to deprive the EEOC of a federal forum in which to enforce such agreements. *See E.E.O.C. v. Liberty Trucking Co.*, 695 F.2d 1038, 1042-43 (7th Cir. 1982); *see also E.E.O.C. v. Henry Beck Co.*, 729 F.2d 301, 305-06 (4th Cir. 1984); *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1511 (11th Cir. 1985); *E.E.O.C. v. Safeway Stores, Inc.*, 714 F.2d 567, 571-72 (5th Cir. 1983). But this line of cases predates *Kokkonen,* and also applies to cases where the EEOC is the party seeking enforcement, *see Hunter v. Ohio Veterans Home,* 272 F. Supp. 2d 692, 696 (N.D. Ohio 2003) ("[t]he involvement of the EEOC is a differentiating characteristic"). In addition, it appears that the principle on which these courts relied would not be extended to a settlement agreement, like this one, resolving a federal lawsuit. *See Langley v. Jackson State Univ.*, 14 F.3d 1070, 1073 (5th Cir. 1994) ("[W]e cannot find[ ] any indication that Congress has established an administrative structure evidencing its intent to provide a federal forum for private parties to enforce settlement agreements ending discrimination disputes after a lawsuit has been filed. Consequently, our decision in *Safeway* is not on point.").

statutes whenever doing so might comport with some of Congress's goals." *Bowman v. Dist. of Columbia*, 2006 WL 2221703, *2 (D.D.C. 2006) (internal quotation marks and citation omitted). "Had Congress intended that *all* [IDEA] settlement agreements . . . be enforceable in federal court, it could have easily adopted a provision to that effect." *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 2007 WL 2219352, *7 (W.D. Mich. July 27, 2007) (emphasis in original), *aff'd*, 615 F.3d 622 (6th Cir. 2010).[23] "The language [of § 1415(e)(2)(A)(iii) and § 1415(f)(l)(B)(i)(I)] is not ambiguous, nor would its literal application produce absurd or unjust results. Consequently, there is no reason to go beyond the application of the law as written.*" Bowman,* 2006 WL 2221703, at *2. Accordingly, the Court holds that the IDEA itself does not confer federal court subject matter jurisdiction over Plaintiffs' claim for breach of the Settlement Agreement because the Settlement Agreement was not entered into as a result of either an IDEA mediation or resolution session.

---

[23] *See Lamie v. U.S. Tr.,* 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.") (internal quotation marks and alteration omitted); *see also* Mark C. Weber, *Settling Individuals With Disabilities Education Act Cases: Making Up Is Hard To Do,* 43 LOY. L.A. L. REV. 641, 663-64 (2010) (hereinafter cited as "Weber, *Settling IDEA Cases*") (noting that "the present legal basis" for federal subject matter jurisdiction to enforce an IDEA settlement agreement other than one falling under either § 1415(e)(2)(F) or § 1415(f)(1)(B) is "shallow," and that, as a result, "[a]n amendment to IDEA to create the jurisdiction would appear to be in order").

## C. FEDERAL QUESTION JURISDICTION BASED ON AN EMBEDDED ISSUE OF FEDERAL LAW

Given that the IDEA does not confer federal court jurisdiction over Plaintiffs' breach of contract claim and that Plaintiffs have not and cannot allege that jurisdiction is properly fixed in this Court based on the diverse citizenship of the parties (28 U.S.C. § 1332), the Court must consider whether there is any other basis for it to continue to assert subject matter jurisdiction over Plaintiffs' claims seeking recovery for breach of the Settlement Agreement.[24] In arguing in favor of federal court jurisdiction, Defendant's brief in support of removal jurisdiction relied

---

[24] The Court notes that the question of subject matter jurisdiction over Plaintiffs' claims for breach of the Settlement Agreement does not turn on the IDEA issue raised by Defendant's summary judgment motion of whether Plaintiffs were required to exhaust their administrative remedies before filing a lawsuit asserting breach of the Settlement Agreement. Failure to exhaust required administrative remedies is an affirmative defense. *See Mosely v. Bd. of Educ. of City of Chi.,* 434 F.3d 527, 533 (7th Cir. 2006) ("A failure to exhaust is normally considered to be an affirmative defense . . . and we see no reason to treat it differently here [under the IDEA].") (internal citations omitted). And it is well established that an affirmative defense cannot be the basis for federal court jurisdiction. *See Vorhees v. Naper Aero Club, Inc.,* 272 F.3d 398, 402 (7th Cir. 2001) ("A case arises under federal law within the meaning of § 1331 only when the claim for relief depends in some way on federal law, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose.") (internal quotation marks and citation omitted). Thus, courts have remanded cases to state court where school districts have removed based on an anticipated defense of failure to exhaust administrative remedies, when the plaintiffs did not purport to rely on the IDEA for their claims. *See, e.g., A.K. v. N. Burlington Reg'l Sch. Dist.,* 2012 WL 295443, at *4 (D.N.J. Feb. 1, 2012) (remanding suit bringing challenge to school district's actions under state statute, and holding that "[w]hether or not Plaintiff must first exhaust IDEA administrative remedies before seeking the requested equitable relief raises a defense which . . . cannot create federal jurisdiction"); *Kalbfleisch v. Columbia Cmty. Unit Sch. Dist. Unit No. 4,* 644 F. Supp. 2d 1084, 1088 (S.D. Ill. 2009) (remanding to state court after concluding that "the only way the IDEA will enter into this case, if at all, is by way of a defense, e.g., that . . . Carter, through his parents, must first have recourse to administrative proceedings to determine what a FAPE is on the facts of this case before pursuing a remedy in court").

primarily on *R.K., ex rel. T.K. v. Hayward Unified School District*, 2007 WL 2778702 (N.D. Cal. Sept. 21, 2007). *See* R. 26. In *R.K.,* the court stated that it had federal jurisdiction over a claim to declare rights under an IDEA settlement agreement because "the purpose of the Settlement Agreement was to resolve the parties' disputes regarding Plaintiff's special education and related services." *Id.* at *6. The court further explained that the settlement agreement in that case "incorporates terms specific to the IDEA, such as FAPE and IEP," and that the court "would have to refer to the IDEA to determine whether the parties complied with their respective obligations under the Settlement Agreement." *Id.* (citing *Hansson v. Norton*, 411 F.3d 231, 235 (D.C. Cir. 2005), for the proposition that, "when a settlement agreement incorporates substantive provisions of federal law such that enforcement of the agreement requires the interpretation and application of federal law," a claim to enforce the settlement agreement arises under federal law).

In the first place, the above-quoted portion of the *R.K.* opinion is dicta; the court already had determined that 20 U.S.C. § 1415(f)(l)(B) conferred subject matter jurisdiction in that case because the settlement agreement in question had been entered into as a result of an IDEA mediation session. Moreover, the jurisdictional principle alluded to by the *R.K.* court—often referred to as jurisdiction arising out of an "embedded" federal claim[25]—has been clarified and limited by the Supreme Court. Outside the area of complete preemption (which does not apply in the IDEA

---

[25] *See Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.,* 707 F.3d 883, 891 (7th Cir. 2013) (federal jurisdiction may exist where a "decisive question of federal law" is "embedded in [the] state law cause of action") (citing *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180 (1921)).

context[26]), the Seventh Circuit has noted that "the existence of a federal issue" in a complaint that relies on state law is "*rarely*" sufficient to allow removal of a state complaint to federal court. *Hartland Lakeside Joint No. 3 Sch. Dist.,* 756 F.3d at 1033 (emphasis added). The Supreme Court applies a four-part test to determine whether federal jurisdiction based on an embedded question of federal law is appropriate. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). The parties have not addressed the *Grable* test, but the Court has little difficulty concluding that it cannot be satisfied here.[27]

---

[26] *See Charlie F., ex. rel Neil F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991 (7th Cir. 1996); *Delgado v. Edison Twp. Bd. of Educ.*, 2014 WL 5761412, at *4 n.3 (D.N.J. Nov. 5, 2014); *Kalbfleisch,* 644 F. Supp. 2d at 1089.

[27] The test asks whether the state law claim (1) "necessarily raise[s] a stated federal issue," (2) that is "actually disputed" (3) "and substantial," and which (4) "a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. A finding that Defendant breached the Settlement Agreement does not *require* a determination that Defendant violated the IDEA because the alleged duties Defendant owed to John and his parents under the IDEA may also constitute contractual duties that exist "separately and concurrently" under the Settlement Agreement. *A.K.*, 2012 WL 295443, at *4 (holding there was no federal jurisdiction under the IDEA where plaintiff claimed the defendant's actions breached its duties to the plaintiff under a state anti-discrimination statute). While it is possible that enforcement of an IDEA settlement agreement might require resolution of issues regarding the parties' rights and obligations under the IDEA, where, for example, the settlement agreement in question incorporates or adopts those statutory rights and obligations as the parties' contractual obligations, the Settlement Agreement in this case does not define the parties' contractual rights and obligations by reference to their respective statutory rights and obligations under the Act. *See* R. 52-6 at 6-9. Moreover, even if the Settlement Agreement had defined the parties' contractual duties by their duties under the IDEA, "[t]he creation of the duty by itself is insufficient to confer federal question jurisdiction on an action." *Reuther v. Shiloh Sch. Dist. No. 85*, 2008 WL 191195, at *3 (S.D. Ill. Jan. 18, 2008) (citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 817 (1986)). Rather, Plaintiffs' claim for breach of the Settlement Agreement also would have to satisfy the additional requirements of the *Grable* test, which it does not. *See Empire Healthchoice*

### D.   SUPPLEMENTAL JURISDICTION

The only other basis for federal jurisdiction over Plaintiffs' claim for breach of

the Settlement Agreement is supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (in

an action for which the court has federal question jurisdiction, court may also

exercise jurisdiction over any state law claims that are so related to the federal

claims "that they form part of the same case or controversy"). As previously noted,

Plaintiffs have alleged facts that could give rise to an alternative claim for violations

of the IDEA independent of their claim for breach of the Settlement Agreement. The

question remains, however, whether they are asserting that alternative claim.[28]

---

*Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006) (the federal element in a state law claim "qualifie[s] as 'substantial'" only when "its resolution [is] both dispositive of the case *and* would be controlling in numerous other cases" because it is a "'pure issue of law' . . . 'that could be settled once and for all'"; in contrast, "fact-bound and situation-specific" issues of federal law are not sufficient to establish federal arising-under jurisdiction) (emphasis added) (quoting *Grable*, 545 U.S. at 313); *see also Gunn v. Minton*, 133 S. Ct. 1059, 1066 (2013) ("[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the state claim 'necessarily raise[s]' a disputed federal issue, as *Grable* separately requires. The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole.").

[28] *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (plaintiffs are "the master" of their complaint and they therefore can "avoid federal jurisdiction" by choosing to rely exclusively on state law); *Merrell Dow Pharm. Inc.,* 478 U.S. at 809 n.6 ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced."); *Pan Am. Petroleum Corp. v. Superior Ct. of Del. In & For New Castle Cnty.*, 366 U.S. 656, 663 (1961) (a plaintiff who has both federal and state causes of action may choose to ignore the federal claims and pursue only the state claims in state court, and it is "immaterial . . . that the plaintiff could have elected to proceed on a federal ground"); *see, e.g., Chambers v. Cincinnati Sch. Bd.*, 2014 WL 1909996, at *3 (S.D. Ohio May 13, 2014) (holding that the court did not have subject matter jurisdiction "where Plaintiff simply asserts that IDEA violations establish a breach of duty underlying state law tort claims"); *Delgado*, 2014 WL 5761412, at *4 ("Plaintiff makes reference to N.J's IEP not to establish a claim under the IDEA, but rather to provide a factual basis for the alleged personal injuries, civil

To answer that question, the Court looks to the allegations of the complaint. *See In re Application of Cnty. Collector of Cnty. of Winnebago, Ill.*, 96 F.3d at 895 (stating the "well-pleaded complaint" rule). Plaintiffs allege: (1) that Defendant had a legal duty under the IDEA "to provide John Miksis with a free appropriate public education," R. 1-1 at 2 (¶ 4); (2) that, in addition to the Settlement Agreement, Defendant "agreed to a 'transition plan' [a copy of which is attached to the complaint] to address John's post-high school development," *id.* at 3 (¶ 8); (3) that, after John started at Orchard Academy, Defendant "ignored the parents' objections and disagreements" to Defendant's "various placement/transition decisions," *id.* (¶ 11); (4) that, in addition to not complying with the terms of the Settlement Agreement, Defendant also failed to comply with the "express terms of the . . . transition plan," *id.* (¶ 12); and (5) that, "[a]fter the [S]ettlement [A]greement was written, the parents enrolled John at Oakton Community College to take various academic courses *as per the transition plan*," *id.* at 4 (¶ 14) (emphasis added); *see also* R. 72 at 12 (arguing that "Defendant's actions violated the law" in addition to the settlement agreement) (all caps omitted). These allegations can be construed as

---

violations, and discrimination visited upon N.J. by Defendant. . . . A fair reading of the Complaint demonstrates that plaintiff has pled state law tort claims. Those claims properly belong in state court."); *A.K.*, 2012 WL 295443, at *4 (remanding case to state court based on lack of federal jurisdiction over IDEA-related claims, holding that, "[w]hile it may be possible that Plaintiff's allegations regarding his IEP *could* give rise to a cause of action under the IDEA, Plaintiff has chosen not to state such a claim or pursue a theory of liability predicated on the IDEA") (emphasis in original); *Reuther*, 2008 WL 191195, at *4 (finding no federal question jurisdiction where the plaintiffs "advance federal law solely as the creator of the duties owed [the student]" and "the theories upon which their claims are based are solely state tort law").

stating a claim under the IDEA for failure to comply with the agreed-to transition plan resulting in a denial of a FAPE. *See, e.g., Sch. Bd. of Lee Cnty., Fla. v. M.M. ex. rel M.M.*, 348 Fed. App'x 504, 511 (11th Cir. 2009) (allegation that a school board had breached the provisions of a settlement agreement that had resulted from an IDEA due process hearing was "also primarily a challenge relating to the provision of a FAPE"); *Pedraza v. Alameda Unified Sch. Dist.*, 2007 WL 949603, at *4 (N.D. Cal. Mar. 27, 2007) (plaintiff alleges that the defendant's "failure to provide the services and reimbursement agreed upon in the settlement agreement resulted in a denial of FAPE, which constitutes a violation of the IDEA").

In sum, if Plaintiffs had decided not to invoke their federal rights, their claims would belong in state court. But it appears that Plaintiffs are proceeding with both state and federal claims (notwithstanding that Plaintiffs have on occasion argued inconsistently that this case presents only a simple breach of contract claim). Accordingly, the Court finds that it has federal question jurisdiction over Plaintiffs' IDEA claims, and supplemental jurisdiction over Plaintiffs' state law claims for breach of the Settlement Agreement.

## II.    SUMMARY JUDGMENT

### A.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all

of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The parties purport to set forth the material undisputed facts regarding their post-settlement dispute in their Local Rule 56.1 Statements. Both sides contend that the fact statement of the other side violates the Local Rule. The Court agrees that the parties' facts statements contain improper argument and are not in compliance with the Local Rule for several other reasons as well. Rather than strike those statements or punish either side with deemed admissions, however, the Court has chosen to consider the statements, together with the record as a whole, in determining whether disputed issues of fact preclude summary judgment in either party's favor. *See Wilbern v. Culver Franchising Sys., Inc.*, 2015 WL 5722825, at *17 (N.D. Ill. Sept. 29, 2015).

## B.  STATE LAW BREACH OF CONTRACT CLAIMS

Because the parties' summary judgment arguments on Plaintiffs' state law claims are more easily resolved than their arguments regarding Plaintiffs' IDEA claims, the Court will address the state law claims first.[29]

### 1.  WHETHER ADMINISTRATIVE EXHAUSTION APPLIES

Defendant's primary argument for summary judgment is that Plaintiffs' claims should be dismissed because Plaintiffs failed to exhaust their administrative remedies. The exhaustion requirement is found in two separate provisions of the IDEA. First, § 1415(i)(2)(A) provides that a cause of action may be brought for violation of the IDEA by any party aggrieved by a final decision of a State educational agency made after an impartial due process hearing, conducted pursuant to subsection (f) of § 1415. *See* 20 U.S.C. § 1415(i)(2)(A). This provision has been read as according a right to judicial review of a claim based on the IDEA only after "all administrative proceedings are completed." *Honig v. Doe*, 484 U.S. 305, 327 (1988) (citing to § 1415(e)(2), the predecessor to § 1415(i)(2)(A)); *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 494 (7th Cir. 2012) ("Ordinarily, a plaintiff

---

[29] In their summary judgment briefs, both parties fail to adequately distinguish between a breach of contract theory of relief and an IDEA theory of relief. For instance, a statement in a party's brief might discuss a contractual law principle, and, the very next sentence might bring up an IDEA principle. This mixing of legal theories is inappropriate and made it difficult for the Court to determine the relevant arguments on any of Plaintiffs' claims. To avoid confusion and a waste of further judicial resources, in the future the parties are to address Plaintiffs' claims under the IDEA separately from their breach of contract claims, keeping in mind that legal arguments and evidence relevant to the former are not necessarily or automatically relevant to the latter.

may not file an IDEA lawsuit without first exhausting available administrative remedies.").

The second exhaustion requirement is found in § 1415(l) of the IDEA, which provides that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l). By virtue of § 1415(l), courts have held that the requirement of administrative exhaustion applies not only to claims brought under the IDEA, but also to non-IDEA claims brought to enforce the rights of children with disabilities under any other federal law. In determining whether the exhaustion requirement of § 1415(l) should apply to a non-IDEA claim, the Seventh Circuit has explained that courts should look to the "theory behind the grievance" to see if the IDEA's process was activated. *Charlie F. ex. rel Neil F.,* 98 F.3d at 992. If the complaint "deals with acts that have both an educational source and an adverse educational consequence," *id.* at 993, then exhaustion is required.

Defendant argues that, pursuant to § 1415(l), exhaustion is required for Plaintiffs' claims even if the theory of those claims is breach of the Settlement Agreement. By its plain terms, however, § 1415(l) only applies to non-IDEA claims

brought under the Constitution or other federal law. It does not apply to state law breach of contract claims such as Plaintiffs' claims for breach of the Settlement Agreement. *See Fortes-Cortes*, 128 F. Supp. 3d at 465-66 ("[P]laintiff's transportation-reimbursement claim does not implicate the IDEA's exhaustion requirement. Properly viewed, that claim is not brought under the IDEA. It is, rather, a request for enforcement of the stipulated order entered in *Fortes-Cortes I.*"); *C.B. v. Sonora Sch. Dist.,* 691 F. Supp. 2d 1123, 1147 (E.D. Cal. 2009) ("There is no question that the IDEA's exhaustion requirements are limited to claims for violations of federal rights.") (citing cases).[30]

Again, Defendant relies on *R.K.*, 2007 WL 2778702, this time for the exhaustion requirement as applied to IDEA settlement agreements. But the *R.K.* court specifically noted that exhaustion applied only to the plaintiff's federal claims. not to his state law claims. *Id.* at *5 n.4 (citing cases). Defendant incorrectly cites to the result in that case, whereby the court ultimately applied exhaustion to a claim for breach of a settlement agreement. The court did so, however, because it found that the plaintiff's claim for a declaration of rights under the settlement agreement at issue in that case was in fact a federal, not state, law claim because that agreement was entered into during an administrative proceeding over which Congress has provided an enforcement mechanism. *Id.* at *6. As previously

---

[30] *See also Watson v. Rich Cent. High Sch.*, 2015 WL 1137658, at *3 (N.D. Ill. Mar. 10, 2015) (dismissing federal IDEA claim based on failure to exhaust and declining to exercising supplemental jurisdiction over state law claims); *Renguette v. Bd. of Sch. Trs. ex rel. Brownsburg Cmty. Sch. Corp.*, 540 F. Supp. 2d 1036, 1045 (S.D. Ind. 2008) (dismissing federal claims for failure to exhaust and dismissing state law claims on the merits).

discussed, the Settlement Agreement here was not entered into pursuant to a mediation or resolution session, and therefore, the IDEA does not create an enforcement mechanism for that agreement.

Defendant nonetheless argues that Plaintiffs' breach of contract claim is really an IDEA claim in disguise because Plaintiffs seek reimbursement for tuition and other expenses, for compensatory education, and for attorneys' fees. According to Defendant, these remedies are only available under IDEA. But only some of the remedies Plaintiffs seek, like compensatory education and attorneys' fees, are only available under the IDEA. For their state law breach of contract claim, Plaintiffs are entitled to recover "an amount equivalent to the difference between the benefits [they] actually received and those to which [they were] due under the Agreement." *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 278 (7th Cir. 1996). While the issue is not currently before the Court, it is likely that, under this contract measure of damages, Plaintiffs at the very least would be able to recover the reimbursements they seek for costs and expenses, such as tuition expenses for ELSA (assuming they prove their breach of contract claim).

Finally, the Court disagrees with Defendant that cases other than *R.K.* involving the issue of exhaustion and IDEA settlement agreements establish a general rule of exhaustion for breach of IDEA settlement agreement claims. The cases Defendant cites all deal with settlement agreements reached during the administrative process, rather than an agreement, like the Settlement Agreement here, entered into to resolve federal court litigation. Aside from the fact previously

discussed that, as a matter of statutory construction, IDEA's exhaustion requirement simply does not apply to Plaintiffs' state law breach of contract claims, the Court also cannot ignore the strong federal policy favoring the voluntary resolution of disputes. *See, e.g.*, *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 616 F.2d 1006, 1013 (7th Cir. 1980). As aptly stated in *Pesek v. Donahue*, 2006 WL 1049969 (N.D. Ill. Feb. 9, 2006), "a settlement allows parties to resolve their disputes by compromise, taking into consideration all relevant risks and costs. In a settlement, each side gives up something . . . [to avoid] the risk of suffering its worst case result. . . . A settlement reflects the parties' mutual decision that a compromise is preferable to the risk and uncertainty of trial. . . . Moreover, each side obtains through settlement the benefits of immediacy—that is, a settlement ends the litigation and the attendant disruption of it, rather than allowing it to continue for, in some instances, years." *Id.* at *4; *see also Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) ("Public policy strongly favors settlement of disputes without litigation. . . . By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before over-burdened courts, and to the citizens whose taxes support the latter."); *Johnson v. Hermanson*, 582 N.E.2d 265, 267 (Ill. App. 1991) ("Public policy in Illinois favors settlements and dictates that, absent fraud or duress, settlements once made should be final.").[31]

---

[31] The same policy considerations would apply in the context of administrative settlements, as the Third Circuit recognized in enforcing such a settlement against the parents of a disabled child. *See D.R. ex. rel M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997) ("In this case, public policy plainly favors upholding the settlement agreement entered between D.R.'s parents and the Board. We agree

Even if the Court disregards the fact that Defendant's cases all involve settlements of administrative claims as opposed to settlement of a federal lawsuit, those cases still do not persuade the Court to adopt Defendant's view that claims for breach of IDEA settlement agreements are necessarily subject to administrative exhaustion. Indeed, as one court has described it, the law in this area is "muddle[d]." *S. Kingstown Sch. Comm. v. Joanna S.,* 2014 WL 197859, at *9 (D.R.I. Jan. 14, 2014) (citing Weber, *Settling IDEA Cases,* at 641-42 ("even though IDEA . . . has been around since the 1970s, litigants are still without clear guidance about how the mechanisms of settlement should work, what the settlement agreement ought to look like, and what to do if either side of the dispute fails to live up to its agreement"). The Court also notes that none of the cases Defendant cites are from this circuit, and the only appellate decisions are non-precedential unpublished and per curiam orders. Further, one case, *F.H. ex rel. Hall v. Memphis City Schs.*, 2013 WL 4056360 (W.D. Tenn. Aug. 12, 2013), was reversed by the Sixth Circuit in a published opinion shortly after the summary judgment briefing in this case was completed. The Sixth Circuit held that, at least insofar as settlement agreements entered into during a mediation session or through the resolution process are concerned, Congress expressly provided that such agreements were "enforceable in

---

that reaching a settlement agreement during mediation, rather than during litigation, does not lessen the binding nature of the agreement on the parties. When the parties entered the settlement agreement at issue in this case, they entered a contract. We will therefore enforce the agreement as a binding contract voluntarily entered by both parties."). The Third Circuit nevertheless limited its holding to the facts of that case, leaving the door open to the possibility that, on other facts, public policy considerations might weigh against enforcement of an administrative settlement in the IDEA setting. *Id.* at 901 n.2.

state or federal court" which necessarily implies that no further exhaustion is required. *F.H. ex rel. Hall v. Memphis City Schs.*, 764 F.3d 638, 645 (6th Cir. 2014).

Finally, several of the cases cited by Defendant require administrative exhaustion of entirely new and previously unexhausted IDEA claims that were unrelated to the issues resolved by the settlement agreement.[32] While Plaintiffs' specific IDEA claims in this case were not previously exhausted, they are related to the exhausted claims at issue in the first lawsuit. Plaintiffs raised an arguably valid point in the first lawsuit that, had the case not settled, those claims should have been resolved without further administrative exhaustion because nothing in the IDEA itself suggests that John's post-senior years of IDEA-eligible secondary school are to be treated any differently than his first four years, notwithstanding that the parties agreed that his educational instruction in that period would take place in a private placement setting as opposed to in the general curriculum at ETHS. *See W.L.G. v. Houston Cnty. Bd. of Educ.*, 975 F. Supp. 1317, 1329 (M.D. Ala. 1997) (noting that court might be able to consider a student's changed circumstances at time of decision because the "need to provide full and realistic relief could override the need for exhaustion," and, that, in such circumstances, "the court would be considering the changed or subsequent circumstances as only incident to a current, viable, and already exhausted IDEA claim"). While Judge Holderman apparently thought differently when he ruled on the mootness question, the fact remains that

---

[32] *See, e.g., T.L. ex rel. G.L. v. Palm Springs Unified Sch. Dist.*, 304 Fed. App'x 548, 549 (9th Cir. 2008) (unpublished); *R.P. and M.P., ex rel. K.P. v. Springdale Sch. Dist.*, 2007 WL 552117, at *4, 7 (W.D. Ark. Feb. 21, 2007); *Sarah Z. v. Menlo Park City Sch. Dist.*, 2007 WL 1574569 at *7 & n.3 (N.D. Cal. May 30, 2007).

Defendant agreed in the settlement of the first lawsuit to resolve those issues notwithstanding Judge Holderman's mootness ruling.

Requiring administrative exhaustion of a claim for breach of a settlement agreement to resolve a federal lawsuit "puts the aggrieved party literally back at square one, having to litigate the case that was supposed to have been resolved." Weber, *Settling IDEA Cases,* at 664. In addition, requiring further exhaustion creates uncertainty surrounding the enforceability of settlement agreements, and the prospect of unenforceability encourages parties "to bide [their] time for so long as [they are] benefited from doing so, and then breach the agreement with no fear of sanction. The [breaching party] would have lost nothing. It would then face only the same prospect of suit on the underlying [ ] charge it would have faced prior to its entering the [settlement] agreement." *Safeway Stores, Inc.*, 714 F.2d at 573. The other party to the agreement, "on the other hand, would have suffered serious prejudice. . . . . Suit undertaking to prove [his or her claim] would have been substantially delayed. Such delay would potentially result in difficulty in proving violations of the Act. [Settlement], instead of being a means of enforcing the law, could well become a dilatory tactic which could be used to make enforcement of [the statute] less effective." *Id.*[33]

---

[33] Defendant claims that the incentives actually work in the opposite direction. That is, Defendant argues that *not* requiring exhaustion "would encourage parents to enter into settlement agreements, ignore the agreements, and then sit back and wait until their student has aged out of special education rights in order to file suit and avoid IDEA's administrative process." R. 55 at 17; *see also* R. 75 at 8. This argument does not make much sense to the Court. To begin with, it requires the Court to make the illogical assumption that a parent would purposefully allow his

Because the Court believes that, as a matter of statutory interpretation, the administrative exhaustion requirement does not apply to Plaintiffs' state law breach of contract claims, it does not need to even consider the policies behind the administrative exhaustion doctrine. Nevertheless, it is worth noting that those policies would not be furthered by requiring exhaustion here. To decide whether Defendant breached this Agreement, the Court need not, as Defendant contends, "decide whether the marking of 'Community College' on John's Transition Plan required Orchard Academy to support John's courses at Oakton." R. 60 at 2. The issue instead, is whether Defendant agreed to provide the services in question by virtue of the language in the Agreement stating that "[a]s discussed during [the May 15, 2009 IEP meeting], . . . John will attend Orchard Academy . . . in its intensive individualized transition program." R. 1-1 at 7. Similarly, the Court need not, as Defendant contends, "understand and interpret the impact of John's parent's failure to contest the May 15, 2009 IEP within ten days of receipt." R. 60 at 2. Instead, the issue is whether the services at issue were a part of the Agreement

or her child to be deprived during his or her school years of educational services to which the parent believes the child is entitled so that the parent could wait until after the child is no longer in school to sue for those services. In addition, the Court does not agree with Defendant that there is a risk that parents will "flagrantly ignore the agreement[ ]." R. 75 at 8. IDEA settlement agreements typically impose on-going duties only on the school district. The parents' consideration for such agreements is to release the school district from their claims under the IDEA, and it is difficult to see in what way parents might "flagrantly ignore" their release. In any event, it would not be rational for parents to "flagrantly ignore" the agreement while waiting for their child to finish school, so that they could later file a lawsuit without having first exhausted their administrative remedies. If they did that, they might have avoided the administrative exhaustion requirement but they probably would not be able to recover in their lawsuit, because they would have breached the settlement agreement.

and, if they were, whether Defendant failed to provide them. No special expertise interpreting and applying the IDEA or additional fact-finding regarding John's abilities and educational goals is required to address these contractual issues. Instead, the Court's job is simply to interpret and apply the Agreement. *See H.C. ex rel. L.C.,* 341 Fed. App'x at 690 ("This enforcement dispute is purely a matter of determining defendant's obligation under the settlement agreement. . . . As such, resolution of the dispute will not benefit from the 'discretion and educational expertise [of] state and local agencies, [or the] full exploration of technical educational issues' related to the administration of the IDEA.") (citation omitted); Weber, *Settling IDEA Cases,* at 664 (actions to enforce settlement agreements usually "will hinge on the straightforward question whether the parties have or have not complied with the letter of the agreement"); *cf. J.K. v. Council Rock Sch. Dist.*, 833 F. Supp. 2d 436, 448-49 (E.D. Pa. 2011) (enforcement of settlement agreements may determine if parents have waived rights under the IDEA or if school districts have contracted to provide benefits above those that the IDEA requires, but those issues are not within the scope of what the hearing officer is given the task of deciding, *i.e.*, the "fundamental question of whether a child received a 'free appropriate public education'").

In addition, one of the most important reasons for requiring administrative exhaustion in the IDEA context—the "inherently changing nature" of what constitutes a FAPE under the circumstances, *W.L.G.*, 975 F. Supp. at 1328—also is not a concern here. The parties determined what an appropriate secondary

education would be for John once and for all when they entered into the Settlement Agreement, which was intended to resolve all aspects of John's secondary school education through the date on which his eligibility for services and aides under the IDEA was to expire. There simply is no need to revisit John's IEP in order to conclude that Defendant failed to abide by the terms of the Settlement Agreement. For this reason, as well as the reasons previously discussed, the Court concludes that Plaintiffs are not required to exhaust their administrative remedies before bringing suit to recover for breach of the Settlement Agreement.

### 2. WHETHER DEFENDANT BREACHED THE SETTLEMENT AGREEMENT

#### a. ORCHARD AIDES AND SUPPORTS FOR COMMUNITY COLLEGE CLASSES

Plaintiffs' first breach of contract claim involves Defendant's termination of Orchard aides and supports for John's academic classes at Oakton Community College.[34] The Court finds that the following facts are both undisputed and relevant to that claim: (1) the parties reached an agreement in the spring of 2009 that John would be enrolled in Orchard Academy's "intensive individualized" program for the upcoming 2009-2010 school year; (2) that agreement was memorialized in the Settlement Agreement executed on July 17, 2009; (3) Smith was not involved in the

---

[34] It appears that Plaintiffs may be seeking reimbursement not only for the aides and supports the parents provided on their own for John to attend community college classes but also for the cost of tuition for those classes. It is not entirely clear to the Court what Plaintiffs' theory of recovery is for the Oakton tuition expenses, and, in fact, Christine Miksis testified at her deposition that the parents were responsible for paying the tuition costs at Oakton. Nevertheless, the issue need not be resolved at this time.

negotiation or execution of that Agreement as she did not replace Gottlieb as the Director of Special Education until shortly before the Agreement was executed; (4) after the Settlement Agreement was signed, John's parents enrolled John in academic classes at Oakton Community College and notified Orchard Academy about that enrollment; (5) at the beginning of the school year, Orchard Academy provided John with transportation, a one-on-one aide, and tutoring support for John's classes at Oakton; (6) Smith learned about the community college classes and the supports Orchard Academy was providing for those classes on or about September 9, 2009, and informed Orchard Academy that Defendant had not agreed to those things; (7) at Smith's instruction, Orchard Academy terminated the supports it had been providing John; (8) Smith sent John's parents a letter informing them that the Agreement did not provide for John to take community college classes or for Oakton to provide transportation, academic tutoring, and a one-on-one aide for those classes; and (9) John's parents objected to Smith's letter and Defendant's termination of Orchard Academy's supports in a written letter notifying Defendant that they believed Defendant's actions violated the Settlement Agreement and that they would be providing the terminated supports at their own expense.

The issue before the Court is whether the facts are undisputed that the supports and aides in question were part of the agreed-to terms of the Settlement Agreement. If they were, then Defendant breached the Agreement by directing Orchard to terminate them. While it is apparent from the record that Smith believed the Agreement did not provide for those aides and supports, it is unclear the basis

for her belief when she admittedly was not involved in the settlement process. Her belief seems to have been based on the same argument Defendant puts forth in its summary judgment briefs, which is that the Agreement does not refer to Oakton or community college as being part of John's educational plan for the 2009-2010 school year; it only refers to Orchard Academy. *See* R. 49-4 at 75, 77. Defendant also points out that the Agreement includes an integration clause, which states that "[t]his Agreement contains all the terms and conditions agreed upon by the parties and no provisions or requirements expressly determined herein may be amended, altered, modified or canceled, except by express written instrument signed and dated by all parties." R. 49-3 at 4 (Settlement Agreement, ¶ 7).

"A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope." RESTATEMENT (2d) OF CONTRACTS § 213. "[A] writing's completeness as measured against it remains a legal question to be determined by the trial judge." *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1219 (Ill. 1994). The Illinois Supreme Court has held that a purchase order that "specifically referred to a telephone proposal that was to be incorporated into the contract" was "clearly, on its face, incomplete." *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 958 (Ill. App. 2001) (discussing *J&B Steel Contractors*, 642 N.E.2d at 1220-21). In those circumstances, "the parol evidence rule did not preclude the plaintiff 'from offering proof of terms allegedly agreed to during the telephone proposal that [were] consistent with and would supplement, but not contradict, the purchase order.'" *Id.* (quoting *J&B Steel Contractors*, 642 N.E.2d at

1221); *see also In re Peregrine Fin. Group, Inc.,* 487 Bankr. 498, 511 (Bankr. N.D. Ill. 2013) ("Even when a contract contains a clear integration clause, parol evidence may be admitted to explain ambiguous terms.").

The introductory language to the paragraph of the Settlement Agreement that deals with John's placement at Orchard Academy states: "As discussed during John's Individual Education Plan ('IEP') meeting held by the parties on May 15, 2009 . . . ." R. 49-3 at 2. By this language, the parties appear to have incorporated the specific details of John's program at Orchard Academy that were agreed to at the May 15, 2009 meeting. Thus, the parties' dispute over the terms on which the first lawsuit was settled cannot be resolved solely on the basis of what is stated in the written agreement itself. By including language in that written document referencing what was agreed to at the May 15, 2009 meeting, both parties "assumed the risk" that the other side "would recollect the discussion [at the May 15, 2009 meeting] differently from how they did," and they are "liv[ing] with the consequences" of that decision now. *Lynch, Inc. v. SamatMason Inc.*, 279 F.3d 487, 491 (7th Cir. 2002).

The only direct evidence in the current record on the issue of whether a community college component to John's Orchard Academy placement was agreed to at the May 15, 2009 meeting is the deposition testimony of Christine Miksis, who said that it was.[35] Defendant argues that Christine's testimony should be ignored

---

[35] Defendant does not present the testimony of Bob Gottlieb, who was Defendant's Director of Special Education at the time and led the May 15 meeting, or of any other school personnel at that meeting. The only testimony of a witness who

because it is "self-serving," but that argument, as Defendant itself admits, R. 75 at 21-22, is not a valid basis for disqualification.[36] Defendant also argues that Christine's testimony is only her "uncorroborated belief," which is "not based on any first-hand knowledge or experience" regarding the academic program at Orchard and whether that program includes support for community college classes. R. 60 at 9. But Defendant conflates the question of how Orchard Academy officially defines its "individualized intensive program" with the question of what was agreed to at the meeting. The ultimate issue in this case is what was agreed to, and Bobrowski's testimony regarding the contents of Orchard's "individualized intensive program" is only a factor to consider in arriving at a decision as to what the agreement was. Christine has personal knowledge relevant to what the parties agreed to because she attended the May 15 meeting. In short, even assuming Plaintiffs are wrong about what Orchard's "individualized intensive program" consisted of, that error would not necessarily require the trier of fact to conclude that no agreement was ever reached for Orchard to provide the aides and supports in question.[37]

---

attended the May 15 meeting presented by Defendant is that of Orchard's Director, Bobrowski. But the Court notes that nowhere in Bobrowski's declaration does he explicitly *refute* Christine Miksis's testimony that community college classes were part of the Orchard program discussed and agreed to at the May 15 meeting. Instead, the declaration only *implies* that they were not. *See* R. 52-4 at 6-7 (Bobrowski Declaration, ¶ 21).

[36] The Court is baffled by the distinction Defendant attempts to draw between Christine Miksis's testimony and Bobrowski's testimony. *See* R. 75 at 22 n.12. Both are self-serving. The Court finds that in both cases the testimony is relevant but not dispositive for purposes of the parties' respective summary judgment motions.

[37] The Court also notes that the question of whether community college classes are a part of Orchard's intensive individualized program is a disputed one, which cannot

Defendant makes a number of other arguments for why the Court should conclude that John's program at Orchard did not include community college classes and/or Orchard support for those classes. *See* R. 60 at 6-11. But most of those arguments concern whether the transition plan or John's IEP required Defendant to provide John with the aides and supports at issue. While the transition plan and/or applicable IEP documents might be relevant to the terms of the parties' Settlement Agreement, focusing solely on those documents ignores the core issue to be decided under Plaintiffs' breach of contract theory, which is whether the parties' agreement

---

be resolved on summary judgment. First, while Bobrowski may be the only witness with personal knowledge of what that program consists of, his declaration leaves the door open on whether there could have been a community college component to John's enrollment in the intensive individualized program at Orchard. *See* R. 52-4 at 5 (¶ 15) ("Although Orchard students in rare circumstances have taken community college courses, they have done so: (a) as a continuing learning or education component specifically required by their IEP (the IEP is traditionally authorized by their home school district); (b) as a component of the student's individualized Orchard program; and (c) after assessment and preparation by Orchard staff."); *see also* R. 60 at 6-7 (arguing that Orchard Academy's program "*typically* [does not] involve courses at outside institutions," and admitting that "from time to time students at Orchard have attended community college classes") (emphasis added). Moreover, Plaintiffs have presented Christine Miksis's testimony as evidence that Bobrowski's declaration may be inconsistent with what he said at the May 15 meeting. Plaintiffs also argue that the Orchard Academy brochure given to them at the meeting supports Christine's recollection of what Bobrowski and others said at the meeting about Orchard's program. Finally, the undisputed fact that Orchard Academy did provide the community college aides and supports when John first started the program (until Smith intervened), also supports Christine's testimony disputing Bobrowski's current declaration. While Defendant argues that Orchard Academy made a mistake when it did so, and that Bobrowski's declaration attests to that mistake, whether Bobrowski made a mistake is itself a disputed issue of fact that cannot be resolved on summary judgment.

reached at the May 15 meeting and incorporated by reference into the Settlement Agreement included those terms.[38]

Defendant also ignores other evidence in the record that supports Christine Miksis's testimony that there was such an agreement. That evidence includes the meeting notes from the March 27, 2009 meeting,[39] which contain an extensive discussion regarding community college and John's parents' opinion that John should continue his academic education the following year through courses taken at Oakton. Although the other members of the IEP team expressed some skepticism about whether John was ready to take classes at the community college, the notes show that, before the meeting was adjourned, Gottlieb *agreed* to consider John's parents' proposal so long as John's academic abilities were assessed by a program

---

[38] For instance, Defendant argues that "neither the law nor the transition plan required ETHS to support John in actual community college courses," R. 55 at 24, but says nothing about whether the parties' agreement did. Defendant also argues that the agreement did not include transportation to community college classes because a document drawn up to reflect John's "transition plan" does not have a check mark by the word "transportation" in the category of aides and supports to be provided. Defendant can make that argument at trial, but the counter-argument is that Plaintiffs understood that document as referring to transportation to and from the Orchard facility. Christine Miksis testified that she understood the Orchard program as including community college classes, and that transportation to and from the Orchard facility to those classes was included as part of that component of the program, much like transportation to and from a field trip is provided by the school district even for students who are not otherwise entitled to transportation to and from the school at the start and end of the school day.

[39] Defendant argues that the meetings notes are hearsay and not admissible at trial. The Court is not making an evidentiary ruling at this time regarding their admissibility. But because Christine was present at those meetings and can testify directly as to what was said, the Court can rely on the notes to buttress the credibility of Christine's testimony in deciding whether there is a disputed issue of fact for trial. *See* footnote 42.

such as Orchard Academy. *See* R. 52-2 at 53-54.[40] Moreover, another member of the

IEP team (John Ostrowski, Defendant's "Transition Coordinator") told John's

parents that he was aware of the fact that students in Orchard Academy's program

sometimes took classes at Oakton (apparently to encourage John's parents to agree

to the Orchard Academy placement, which they at first were skeptical of but later

---

[40] Defendant argues that no agreement could have been reached regarding community college because Orchard's assessments had not yet been completed in the fall of 2009 when John's parents enrolled him in Oakton. Plaintiffs counter, however, that the parties agreed that the educational supports and services John was receiving at the time of the agreement (*i.e.,* his senior year of high school) would remain in effect until those assessments were completed. This last requirement, Plaintiffs contend, is part of the written agreement, which states that "[d]urging the period of Orchard Academy's individual assessment of John, John will receive those aid[e]s, including but not limited to speech and occupational therapy, at the same level he received during the 2008-2009 school year (with the exception of Adapted Physical Education, which will not be provided)." R. 49-3 at 2. Defendant argues that community college classes do not constitute "aid[e]s," within the meaning of this provision. Had Defendant sat down to talk with the parents over why they thought otherwise before acting precipitously to cut off the Orchard aides and supports, it might have discovered the source of the confusion. According to Christine, she understood from the May 2010 meeting that community college already was a part of the Orchard program so that those classes fell under the language in the Settlement Agreement referencing John's placement at Orchard Academy. The language in the Settlement Agreement referencing the aides and supports that were to continue while John was being assessed included the one-on-one aide and academic tutoring Orchard had been providing for those classes. Christine testified that she understood those aides and supports were available at Orchard because Bobrowski brought up the issue of a one-on-one aide and the parties agreed John would have one. Christine did try to explain her position in the email she sent to Smith, but instead of meeting in an attempt to understand the other side's position, the parties almost immediately locked horns over legal issues such as whether either side had the right to make a "unilateral" placement decision, whether a violation of John's "stay-put" IEP had occurred, and whether the opposing party had the burden of calling a meeting or filing an administrative complaint. The parties continue to focus on these distracting statutory issues, when the question for purposes of Plaintiffs' breach of contract claim is whether there was a mutual understanding along the lines of what Christine testified to at her deposition.

did agree to). *Id.* at 54. While the meeting was continued until May without any resolution of the community college question at that time, the March meeting is relevant to an understanding of what was decided at the May 15 meeting.

Finally, Plaintiffs point out that in mid-August, Christine Miksis communicated by email with Bobrowski about the community college classes, and that at the start of the school year, an employee of Orchard, Sarissa Hahn, communicated with John's parents about the aides and supports Orchard would be providing for John's classes. This correspondence supports Plaintiffs' position that the Agreement reached by the parties at the May 15 meeting included Orchard aides and supports for John's academic courses at Oakton. At the very least, it shows that *Christine* understood the Agreement in this way. It suggests, as well, that Bobrowski also understood the Agreement in this way, because there is no indication that, after receiving Christine's email, he questioned Christine regarding her expectation that Orchard would be providing aides and supports for John's community classes. What is more, Orchard Academy in fact *did* provide the aides and supports for John's academic classes at Oakton, until Smith intervened a week or so into the school year and directed Bobrowski to cease doing so.[41]

---

[41] Bobrowski states in his declaration that he only provided the supports for John's attendance at community college because he supposedly "took Ms. Miksis at her word that the community college courses were part of John's required programming." R. 52-4 at 6 (Bobrowski Declaration ¶ 21). He further represents that he "had no reason to disbelieve Ms. Miksis at that time." *Id.* But that statement rings somewhat hollow given that Bobrowski admittedly attended the May 15 meeting to discuss the Orchard program. It is logical to assume that if community college classes were not part of the plan discussed and agreed to at the May 15 meeting then Bobrowski would have questioned Christine's email or at least

A settlement agreement "is enforced just like any other contract." *Lynch, Inc.*, 279 F.3d at 489. Moreover, "[o]ral settlement agreements are enforceable under Illinois law if there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement. The essential terms must be definite and certain so that a court can ascertain the parties' agreement from the stated terms and provisions." *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007). "It is long settled law that mutual assent is the first requisite to formation of a contract. It is generally the objective manifestation of intent which controls. It is only when there are no objective indicia of intent, or the subject matter of the bargain is described in ambiguous terms that the court must look to the subjective intent of the parties." *Caporale v. Mar Les, Inc.*, 656 F.2d 242, 244 (7th Cir. 1981). "Under the objective theory [of contract], intent to manifest assent in Illinois is revealed by outward expressions such as words and acts. The parties do not need to share the same subjective understanding as to the terms of the contract. But there must be a meeting of the minds or mutual assent as to the terms of the contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) (internal quotation marks and citations omitted). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991). A meeting of the minds sufficient to form

sought confirmation or further clarification from Defendant before providing the disputed services.

an enforceable contract requires that the parties "assent[ed] to the same things in the same sense on all essential terms and conditions." *Quinlan v. Stouffe*, 823 N.E.2d 597, 604 (Ill. App. 2005).

The above test for whether an agreement existed between the parties must be applied at the time they entered into the alleged settlement. Thus, the crucial issue here is whether there was an actual meeting of the minds, *i.e.,* both sides understood the same thing, at the May 15 meeting. Neither party has sufficiently focused on that issue. It is true, as Plaintiffs argue, that the only witness present at the May 15 meeting whose testimony is before the Court on summary judgment is Christine Miksis. Plaintiffs therefore argue that they are entitled to summary judgment in their favor on this issue. But the Court disagrees, for several reasons.

First, notes taken at the May 15 meeting indicate that a discussion took place that suggests John's parents may have abandoned their position from the March 27 meeting regarding John taking community college classes.[42] Second, the fact that the Settlement Agreement itself does not specifically mention community college classes, while not determinative for the reasons previously discussed, nonetheless

---

[42] The notes indicate that Plaintiffs' then-attorney, Michael Graham, stated that, since the last meeting in March, John's parents had "decided that Oakton is not necessarily appropriate for John at this time." R. 52-2 at 22. As Defendant itself argues, however, the meeting notes are probably not admissible at trial. Graham was not deposed, so the Court does not know what he would testify to if asked. Christine testified at her deposition that the meeting notes do not accurately reflect Graham's comments. Nevertheless, the Court can consider Graham's out-of-court statement in deciding whether to deny summary judgment in Plaintiffs' favor on the theory that it is possible Defendant will be able to put the testimony in question "into admissible form" by the time of trial. *Estate of Thurman v. City of Milwaukee*, 197 F. Supp. 2d 1141, 1146 (E.D. Wis. 2002).

creates a disputed fact issue as to whether those classes were an agreed-to part of the settlement. Third, Christine's deposition testimony was not specific enough to establish that what she understood had been decided at the May 15 meeting was also what Defendant understood had been decided at that meeting. Christine's subjective belief that community college classes were a part of the agreement is not sufficient to establish a meeting of the minds. It may be that Christine is able to testify to details about the meeting that will indeed show a meeting of the minds on the topic. But her deposition testimony does not accomplish that result. Moreover, even if she can testify to relevant facts to show a meeting of the minds, the credibility of that testimony must be taken into account.[43]

In sum, it is up to the trier of fact to decide whether there was a meeting of the minds at the May 15 meeting regarding John's enrollment in community college classes and Orchard's support for those classes. Therefore, summary judgment in favor of Plaintiffs on their breach of contract claim regarding Orchard aides and

---

[43] Apart from whether there was an actual agreement on the community college question, Christine Miksis also seems to rely on an assumption that there had to be an academic component to John's program, and that community college was the only place where John was going to get that academic component. As Christine Miksis testified, the courses she enrolled John in were not college classes; they were remedial classes designed to continue the academic component of John's *high school* education. While the Court sympathizes with the parents' belief that John was entitled to academic educational services in *every* year of his secondary school education including his post-senior years, whether that is in fact a requirement under the IDEA is not so obvious. As a result, John's parents could not just assume that it was part of the agreement. At least insofar as their breach of contract claim is concerned, they will have to show that there was an actual meeting of the minds that academic courses at Oakton were a component of John's agreed-to program at Orchard.

supports for community college classes would not be appropriate. If that issue is to be resolved, it must be at trial.

**b.  PACE/ELSA PROGRAM**

Plaintiffs' second breach of contract claim involves Defendant's termination of John's placement at Orchard Academy and disenrollment in the school district for nonattendance. The Court finds that the following facts are undisputed and relevant to that claim: (1) in the fall of 2009, John both attended academic classes at Oakton Community College and participated in Orchard Academy programs when he was available to do so outside of his academic classes; (2) Smith did not object to this arrangement out of deference to John's parents' desire for John to take academic classes at Oakton; (3) the parties met on several occasions in this time period to discuss Orchard Academy assessments of John and to map out details of John's IEP for the 2009-2010 school year; (4) Smith discussed John's lack of attendance with the parents during some of these meetings, but never invoked the school district's attendance policy or warned John's parents that John was at risk of having his Orchard placement terminated or being disenrolled from the school district because of his absences; (5) on or about March 5, 2010, Smith sent John's parents a letter by regular mail notifying them that John's placement at Orchard would be terminated as of the end of the day on March 15, 2010 because of his failure to attend more than one day a week since January; (6) in addition to notifying John's parents of John's termination for nonattendance, Smith's letter also offered to reinstate John's Orchard program provided John's parents agreed to Defendant's proposed IEP,

which included the requirement that John attend Orchard Academy on a full-time basis; (7) Smith also stated that if John's parents did not want to accept the full-time placement being offered at Orchard Academy, they could contact her about setting up a meeting to discuss an alternative placement to Orchard Academy; (8) John's parents' attorney responded to the notice of termination by sending an email to Defendant's attorney on March 15, objecting to Defendant's unilateral decision to terminate John's placement, noting that the parents disagreed that the Orchard program in which John had been placed since Smith intervened provided John with an appropriate education, and stating that further discussion was necessary; (9) on March 15, Defendant terminated John's placement at Orchard, and, apparently because John's parents had not contacted the school district to accept the IEP proposal of placement at Orchard with John's full-time attendance, Defendant also disenrolled John from the school district on that date; (10) no further meetings or written correspondence took place, and John's parents never contacted Smith to reenroll John in the school district, to reinstate John's program at Orchard, or to discuss an alternative placement to Orchard Academy.

Plaintiffs argue that Defendant breached the Settlement Agreement when it terminated John's program at Orchard Academy and enrollment in the school district for nonattendance. Defendant argues, however, that the termination was proper because of John's failure to attend and pursuant to the school district's "practice," R. 52 at 16 (Def. SOF ¶ 65), of disenrolling students for nonattendance. The evidence in the record regarding the existence of such a "practice" consists solely

of Smith's testimony, which is vague and offers no details or proof that the "practice" even exists. *See* R. 49-7 at 98-100. Defendant also describes the "practice" as a "neutral District policy," R. 61 at 15, but again, offers no evidence to back up that characterization, either as to the existence of a "policy" or as to the "neutral" manner in which it supposedly has been applied. In any event, Defendant fails to support any legal argument that the school attendance practice or policy constitutes a defense to Plaintiffs' breach of contract claims.

Defendant entered into the Settlement Agreement, which indisputably provides that John is to be enrolled in Orchard Academy for the 2009-2010 school year. Nothing in the Agreement states that Defendant had the discretion to terminate that program and disenroll John from the school district due to nonattendance. The Third Circuit "has explained in the IDEA context that when a 'settlement agreement was voluntarily and willingly entered by the parties,' the agreement constitutes 'a binding contract between the parties and should have been enforced as written.'" *J.K.,* 833 F. Supp. 2d at 447 (quoting *D.R. ex. rel M.R.*, 109 F.3d at 898). Moreover, it further has said that "[a] parent may waive her child's right to a FAPE" by entering into an agreement "settl[ing] for less than s/he later believes the law provides." *Id.* (quoting *Ballard ex. rel Ballard,* 273 Fed. App'x at 188). So too can a school district "contract[ ] to provide certain benefits *above* those that the IDEA requires." *Id.* at 448 (emphasis added). In other words, Defendant may have had a right under its attendance policy to terminate the Orchard Program

and disenroll John (a position Plaintiffs strongly dispute), but that does not mean Defendant had a contractual right under the Settlement Agreement to do so.

It is undisputed that Smith tolerated John's nonattendance during the fall of 2009, which suggests that John's full-time attendance at Orchard was not a required condition of the Settlement Agreement, or that, if it was, Defendant waived the condition or breached the contractual duty of good faith and fair dealing by failing to warn Plaintiffs prior to invoking that policy and terminating John with only a few days advance notice (if even that[44]). Defendant contends that John's attendance declined even further starting in January 2010. Defendant already would be on shaky ground to argue that the Agreement can be read as imposing a full-time attendance precondition on Defendant's contractual obligations; but it is even more so if it is trying to say that the Agreement impliedly gave it the discretion to invoke its policy according to some undefined standard that is not in the Agreement and indeed has not been shown by Defendant to even exist. Accordingly, even assuming Defendant had a school policy that allowed Defendant to disenroll John for nonattendance, Defendant cannot show that its school policy overrides the Settlement Agreement, which does not condition John's contractual right to enrollment at Orchard Academy on his attendance for a specific number of days per week.[45] The Settlement Agreement gives John a contractual right to the Orchard

---

[44] Smith's letter could not have been sent any earlier than March 5. It was sent by regular mail, so Plaintiffs had at most a few days to respond before Defendant took the threatened action of terminating John's program effective March 15.

[45] Smith testified that she believes John's parents violated the Settlement Agreement by not having John participate in the Orchard program, but, again, any

placement, and Defendant has not provided any basis for the Court to conclude that Defendant had the contractual right to terminate John's program and disenroll him from the school district.

### (i) ANTICIPATORY BREACH THEORY

But Defendant's breach of the Settlement Agreement in the manner described above does not resolve the disputed issues before the Court. Because John was not attending Orchard more than one day a week, it would be difficult for Plaintiffs to argue that John suffered any injury as a result of Defendant's termination of his Orchard placement. The injury Plaintiffs suffered, and for which they seek recovery, is Defendant's refusal to pay for John's educational program beginning in the 2010-2011 academic year through the last day before John turned twenty-two. According to Plaintiffs, John's disenrollment constituted an anticipatory breach of the remaining, unexecuted parts of the Settlement Agreement. As such, Plaintiffs argue, they were entitled to treat the Settlement Agreement as having been unilaterally terminated by Defendant, to seek replacement services for the unperformed services in the Agreement still owed by Defendant, and to then seek recovery from Defendant for the costs of those replacement services (*i.e.,* the ELSA program).

---

implied full-time attendance policy was waived by Defendant's past practice of allowing John to attend community college classes in the fall, and Defendants cannot point to any requirement in the Settlement Agreement that imposes an attendance requirement of a specific number of days per week that John breached beginning in January 2010. Moreover, Christine Miksis testified that she believed John *was* participating in the Orchard program even when he was at community college classes, because those classes, which were supposed to have been supported by Orchard, were part of that program.

"When a party to an executory contract gives notice of his intention not to comply with his obligations, the other party may treat such notice as an anticipatory breach and consider the contract terminated without waiting for the completion of the contract pursuant to its terms. However, before the renunciation can be treated as an anticipatory breach, there must be a positive and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed in the contract arrives. A definite statement to the second party that the first party either will not or cannot perform the contract will operate as an anticipatory breach." *Student Transit Corp. v. Bd. of Ed. Of City of Chi.*, 395 N.E.2d 69, 71 (Ill. App. 1979).

Defendant relies on Smith's March 5, 2010 letter to argue that it did not unequivocally repudiate that portion of the Settlement Agreement relating to John's placement in PACE or another similar program beginning in the 2010-2011 academic year. That letter on its face suggests that the only consequences of John's nonattendance were for the remainder of the 2009-2010 academic year. After notifying John's parents regarding their options for reinstating John's program in that year, the letter, in closing, states that, "[i]n any event, we should schedule a meeting in the near future to discuss John's placement for 2010-2011 pursuant to the settlement agreement." R. 52-6 at 19. It is undisputed that the parties never met after this point "to discuss John's placement for 2010-2011 pursuant to the settlement agreement." Such a meeting would not have been required, however, if John had been accepted into PACE. If, as Smith testified, she did not know at the

time she wrote the March 5 letter that John's application to PACE had been rejected, then it seems odd she suggested a meeting to discuss John's placement for the following year. One possible explanation for Smith's suggestion for a meeting is that, as Christine Miksis testified at her deposition, Smith already had repudiated the PACE placement even before she knew that John had not been accepted. According to Christine, at several meetings held in December 2009 and January 2010, Smith and Whitten, Defendant's attorney, had informed Plaintiffs that Defendant "was not going to give assistance for PACE" because "it was not an ISBE-approved facility." R. 49-7 at 99, 104 ("They brought in the person who is in charge of placements from ETHS who stated unequivocally that there was no way that the high school would support a placement at PACE."). There is no contrary evidence in the record to dispute this testimony.

Smith's statements to Plaintiffs at the meetings in January to the effect that Defendant would not pay for a placement at PACE because it was not a state-approved school constituted an unequivocal repudiation of the PACE provision of the Settlement Agreement. But after that repudiation, Plaintiffs learned John had not been accepted into PACE. This new development meant that another contractual provision came into play, the provision stating that if John was not accepted into PACE, "the parties agree to meet to discuss and consider other appropriate placement options for John's post-secondary transition education." R. 49-3 at 3. Defendant argues that the Agreement "clearly predicates any alternative placement for John other than PACE on a meeting of and approval by

the IEP team." R. 55 at 26. But according to Christine, not only had Defendant already repudiated its obligation to pay for the PACE program, it also had repudiated its obligation to pay for any comparable program. Christine testified that when Smith and Whitten told her that Defendant would not pay for PACE because it was not a state approved program, Plaintiffs sought Smith's assistance in finding a comparable replacement program to PACE. The only program Smith would suggest was one of Orchard's programs, which Plaintiffs did not believe was comparable to PACE. In other words, according to Christine's testimony, Defendant repudiated both the PACE placement and any reasonable alternative to PACE.

"'When one party to a contract repudiates his contractual duties before time for performance, the other party may elect to treat the contract as ended. In such cases *the nonbreaching party is not required to tender performance or to comply with conditions precedent.*'" *Bituminous Cas. Corp. v. Commercial Union Ins. Co.*, 652 N.E.2d 1192, 1197 (Ill. App. 1995) (quoting *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 373 N.E.2d 863 (Ill. App. 1978)) (emphasis added). Under a theory of anticipatory breach, Defendant's repudiation of its contractual obligation to pay for PACE or a comparable program relieved Plaintiffs of the condition precedent in the contract to meet with Defendant for purposes of discussing an alternative program to PACE.

Added to the above evidence is the undisputed fact that, notwithstanding the closing sentence in the March 5 letter about meeting to discuss next year's placement, Defendant never called a meeting to have that discussion. Moreover,

Smith testified that the reason she did not contact Plaintiffs about an alternative program to PACE after she learned of PACE's rejection of John's application was that she "wasn't notified that he had applied or accepted and so I didn't see any reason to ask the parent." R. 49-4 at 65. When asked to explain her answer further, and, specifically, whether she felt "the contract obligated her to try to convene a meeting," Smith responded "[n]o, and I don't even think he was still going to school at that time." *Id.* In other words, Smith apparently believed that Defendant could invoke a school attendance policy to disenroll John from the school district and thereby terminate John's future rights under the Settlement Agreement. To the extent Smith's testimony was ambiguous on this point, Defendant was not the least bit vague in its response to Plaintiffs' Local Rule 56.1 Statement. Defendant's response unequivocally states:

> [A]fter John was disenrolled as an ETHS student on March 15 . . . the District *had no further obligations under* the IDEA or *the settlement agreement.*

R. 61 at 16-17 (¶ 38) (emphasis added).

But Defendant's assertion that it had no further obligations to John under the Settlement Agreement is directly contradicted by the terms of the Settlement Agreement, which provides that:

> [A]ll other provisions of this Agreement shall remain in effect *regardless of John's* acceptance, non-acceptance or *termination from* or of *the Orchard Academy* or PACE programs.

R. 1-1 at 7 (emphasis added). As this contractual language shows, the Agreement plainly provides that Defendant *did* have a continuing obligation to Plaintiffs

notwithstanding Defendant's termination of John's program at Orchard Academy. This was a *contractual* obligation, independent of John's enrollment in the school district, and thus it could not legally be declared terminated by virtue of disenrollment. In short, Defendant's position that it had no further contractual obligations to Plaintiffs unless and until they reenrolled John in the school district is simply not accurate. The contractual provision related to the PACE placement for the following school year and beyond continued to be in effect. Defendant's position that it was no longer in effect by virtue of Defendant's disenrollment of John and John's parents' failure to seek reenrollment constituted a repudiation of that part of the Agreement.

In sum, Smith's repudiation of PACE and failure when asked to suggest any suitable replacement options was followed by Defendant's disenrollment of John as a student in the school district. Smith's position was that John's disenrollment cut off his contractual right to an educational placement in the following school year, and therefore that she had no duty to contact Plaintiffs about that placement. Consistent with that belief, at no time between sending the March 5, 2010 letter and John's enrollment in ELSA did Defendant ever call a meeting to discuss an alternative placement. These facts lead the Court to conclude that, despite the March 5, 2010 letter's reference to a meeting to discuss next year's placement, by May 2010 when Plaintiffs finally took action on their own to enroll John in a replacement program, Defendant had unambiguously repudiated the placement provision in the Settlement Agreement regarding John's educational program

beginning in the 2010-2011 academic year through the last day before he turned twenty-two.

### (ii) MATERIAL BREACH DOCTRINE

Anticipatory breach is not the only contract law principle potentially applicable to Plaintiffs' claim to recover the costs of the ELSA placement. "It is black letter law in Illinois and elsewhere that only a 'material' breach of a contract provision by one party will justify non-performance by the other party." *Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir. 1983). "[T]he determination of 'materiality' is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." *Id.* Assuming Plaintiffs breached the meet-to-discuss provision in the Agreement, the Court concludes that breach was not material to Defendant's contractual obligation to pay for a replacement program for PACE. The bargained-for objective of the contracting parties was to provide John with a residential placement program at Defendant's expense beginning in the 2010-2011 academic year.[46] Excusing Defendant from its

---

[46] The language in the Settlement Agreement regarding the meeting requirement for agreeing upon an alternative program is somewhat ambiguous, as it states only that the parties agree that they would "meet to discuss and consider other appropriate placement options." R. 49-3 at 3. While the Agreement does not specifically say that Defendant would pay for another placement option if John were

contractual obligation to pay for a private educational placement for John would be a huge windfall to Defendant since that placement was a significant part of the bargained-for exchange by which Plaintiffs released their claims against Defendant. On the other hand, it would not defeat the bargained-for objective of the parties or cause disproportionate prejudice to Defendant to require Defendant to pay for a replacement program notwithstanding the parties' failure to mutually agree on a replacement program, so long as the replacement program imposes no greater burden on Defendant than the PACE program would have.

Moreover, the Court rejects Defendant's apparent belief that the Agreement's meeting requirement imposed obligations *only* on John's parents. *See* R. 55 at 27 (arguing that John parents were "not relieve[d] . . . of *the responsibility* in the Agreement to meet with the IEP team to decide on any alternative placement that would be made for PACE") (emphasis added). The obligation to meet and discuss was an obligation imposed under the Agreement *on both parties. See, e.g., J.K.,* 833 F. Supp. 2d at 453 ("The settlement agreement merely provides that 'the *parties*

---

not accepted into the PACE program, the provision would not make much sense unless a payment obligation were implied. The language must be read in context of the overall agreement, by which Plaintiffs gave up viable claims for compensatory education and attorneys' fees in return for, among other things, a commitment by Defendant to provide John with an educational program for his remaining IDEA-eligible years. *See id.* at 1 (second *Whereas* clause) ("Whereas, the parties, in exchange for the good and valuable promises and consideration contained herein have agreed to compromise the lawsuit in or . . . to provide for John's educational needs appropriately , . . . and to continue with John's education cooperatively . . . ."). Moreover, Defendant does not appear to argue it did not have an obligation to pay for a replacement program; instead, its only argument is that it was relieved of that contractual obligation by Plaintiffs' failure to call a meeting for purposes of mutually agreeing on the replacement program.

agree to reconvene the IEP team . . . to discuss transition activities during the 2009-2010 school year' . . . One cannot fairly read this language to impose a duty only on *the District* to convene the IEP team or develop a draft IEP.") (emphasis in original) (footnote omitted). As in *J.K.,* "the contract evinces no ambiguity" as to whether John's parents were solely responsible for convening a meeting to discuss alternative programs to PACE; "[t]o the contrary, the contract plainly states that 'the parties' . . . will perform th[at] task[ ].'" *Id.* Thus, either Plaintiffs' failure to convene a meeting to discuss a replacement program did not breach any obligation it had under the Settlement Agreement "as the contract did not impose a duty on [Plaintiffs] to accomplish [that] task," *id.* at 454, or, the meet-to-discuss provision imposed a contractual duty on both parties, in which case Defendant also breached that duty by failing to call a meeting, and Defendant's breach would constitute a waiver of the same breach by Plaintiffs. "Consequently, the result that [Defendant] suggest[s] should follow from a breach—the invalidation of the pendent placement provision—does not obtain." *Id.*

For all of these reasons, the Court must agree with Plaintiffs that the "banter between the parties about . . . who had the responsibility to convene a meeting" (R. 49 at 8) ultimately is beside the point insofar as Plaintiffs' breach of contract claim is concerned. It is unfortunate that the parties' relationship deteriorated to the point where they are now making excuses for their respective failures to call a meeting. As Plaintiffs suggest, both sides were playing a "game of chicken," R. 62 at 10, and the Court must now apply contract law principles to determine who is the

winner. By playing the game, Defendant assumed the risk that it would lose. Defendant's game strategy appears to have been to declare John "disenrolled" from the school district and to then sit back and wait for Plaintiffs to do something about it, in hopes that Plaintiffs would not act and Defendant could thereby avoid its contractual responsibility to pay for either PACE or a replacement program. Regardless of whether that strategy might work under the applicable statutory principles (an issue the Court is not deciding at this time), Defendant's contractual obligations were separate and distinct from its statutory obligations. And from a contract law perspective, Defendant's strategy violated Plaintiffs' contractual rights.

### (iii) SUPPLYING THE MISSING CONTRACTUAL TERM ON WHICH THE PARTIES FAILED TO AGREE

That having been said, the Court is still faced with the issue of determining Defendant's payment obligations given that the parties never reached an agreement on a program to replace PACE. Here too, however, well established principles of contract law provide the answer. As the Seventh Circuit has explained, "a contract with open terms can be enforced" if "the terms to be agreed upon in the future can be determined independent of a party's mere wish, will, and desire . . ., either by virtue of the agreement itself or by commercial practice or other usage or custom." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 564-65 (7th Cir. 2012) (internal quotation marks and citations omitted); *see also Acad. Chi. Publishers*, 578 N.E.2d at 984 ("It is not uncommon for a court to supply a missing material term," so long as there is a "suitable standard" available for court to apply). The parties agreed to agree later on a suitable replacement program if John was not accepted into PACE.

The failure of the meet-to-discuss requirement being met would prevent enforcement of Defendant's core promise to pay for a replacement program only if the Court had no suitable standard to use in supplying the term that was supposed to have been agreed upon at that future meeting. Here, the Agreement provides a suitable standard for the Court to use, that standard being the PACE program to which Defendant originally agreed. Had a meeting been called, Defendant would have been contractually bound by its duty of good faith and fair dealing to agree to a replacement program that did not impose any materially greater hardship on Defendant than the PACE program. *See Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.,* 692 F.3d 580, 592 (7th Cir. 2012). Therefore, to recover for ELSA, Plaintiffs must show that ELSA was an appropriate replacement for the PACE program in that it did not impose a significantly greater burden on Defendant than the PACE program would have imposed.

Plaintiffs argue that they are entitled to summary judgment on the issue of whether the ELSA program is no more burdensome on Defendant than the PACE program would have been because Christine Miksis testified that ELSA was a comparable program to PACE and there is no other evidence in the record to dispute that testimony. *See* R. 49 at 7. While it is true that Defendant has not submitted any evidence to contest Christine's testimony, the Court agrees with Defendant (R. 61 at 19-20) that Plaintiffs have not met their burden on summary judgment because Christine's opinion is not sufficient to establish that ELSA is no more burdensome on Defendant than PACE would have been. Therefore, Defendant's failure to submit

contrary evidence does not warrant summary judgment in Plaintiffs' favor on that issue, and a trial will be needed to resolve it.

## C.     PLAINTIFFS' FEDERAL LAW CLAIMS UNDER THE IDEA

The Court will now discuss Plaintiffs' claims under the IDEA for denial of a FAPE.

### 1.     WHETHER PLAINTIFFS WERE REQUIRED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES

There is no question that Plaintiffs' federal IDEA claims trigger the administrative exhaustion requirement. The issue raised by those claims relates to the special educational services and aides to which John was entitled in the IDEA-eligible period after he completed his senior year of high school, plainly a matter that the IDEA administrative procedures and remedies can redress. Nevertheless, because exhaustion is an affirmative defense, it is subject to waiver and estoppel principles. *See Gallegos v. Mt. Sinai Med. Ctr.*, 210 F.3d 803, 809-10 (7th Cir. 2000) (estoppel may be applied to preclude the assertion of failure to exhaust administrative remedies as a defense); *Charlie F. ex. rel Neil F.,* 98 F.3d at 991 ("lack of exhaustion usually is waivable"); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (non-jurisdictional prerequisites to suit in federal court are "subject to waiver, estoppel and equitable tolling"). In addition, courts have recognized that the exhaustion doctrine "is not to be applied inflexibly." *Deveaux v. Vallas,* 2001 WL 699891, at *4 (N.D. Ill. June 21, 2001) (internal quotation marks and citations omitted). And the Supreme Court has held that

"parents may bypass the administrative process where exhaustion would be futile or inadequate." *Honig*, 484 U.S. at 327

### a.   WAIVER

Plaintiffs contend that Defendant has waived its right to assert the administrative exhaustion defense by participating in this litigation. Defendant first raised the administrative exhaustion requirement when it filed an amended answer approximately five months after the lawsuit was filed. R. 25. After more than a year of discovery and Plaintiffs' filing of their summary judgment motion, Defendant finally pressed the exhaustion issue in its own summary judgment filing. Plaintiffs have a valid argument that Defendant "has not exercised due diligence in asserting the defense of failure to exhaust administrative remedies." *Stevenson v. Hochberg*, 2009 WL 1490828, at *4 (D.N.J. May 26, 2009) (finding defendant waived the right to assert the defense of failure to exhaust administrative remedies where he engaged in nine months of litigation against plaintiff, including motion practice, written discovery and depositions).

Defendant argues in response that exhaustion, as an affirmative defense, cannot be raised any sooner than on summary judgment and that, in any event, it could not "speculate prior to discovery what, if any, issues would implicate IDEA and thus require exhaustion." R. 60 at 5. Defendant's first argument is incorrect. "[W]here, as here, the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense," the court can rule on the affirmative defense at the pleading stage. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir.

2005). The Court also is somewhat skeptical of Defendant's second argument against waiver insofar as Defendant's exhaustion defense primarily relies on a general rule requiring administrative exhaustion of claims based on IDEA settlement agreements. Defendant did not need discovery to put forth this exhaustion argument because the complaint clearly put Defendant on notice that the basis of Plaintiffs' claims was the Settlement Agreement entered into to resolve Plaintiffs' previous IDEA lawsuit.

Nevertheless, the Court already has held that Plaintiffs' claims based on breach of the Settlement Agreement are not subject to the administrative exhaustion requirement so Plaintiffs' waiver theory is irrelevant for those claims. Insofar as Plaintiffs' IDEA claims are concerned, it is difficult for the Court to determine on the current record whether Defendant should have raised the exhaustion defense any earlier in these proceedings because the parties' arguments do not clearly distinguish between a theory of recovery based on the Settlement Agreement and a theory of recovery based on the IDEA. But even if waiver were a valid argument against Defendant's exhaustion defense to Plaintiffs' IDEA claims, it does not seem to be a particularly compelling one in the context of this case because Plaintiffs have not explained how they have been prejudiced by Defendant's delay in raising the exhaustion defense. The time for filing an administrative claim already had passed when Plaintiffs filed suit, so that an earlier ruling on the exhaustion requirement would not have led to Plaintiffs seeking an administrative remedy. At best, had exhaustion been decided at an earlier point in these

proceedings, the current summary judgment briefs might have been less complex. Nevertheless, the Court will reserve a final ruling on the waiver issue to allow the parties to more fully develop their arguments, if they wish to continue to make them, in light of the Court's thoughts on the issue as expressed herein.[47]

### b.  FUTILITY OR INADEQUACY OF EXHAUSTION

"[A]pplication of the exhaustion doctrine is intensely practical," and "[t]he ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the [applicable] factors, but should also be guided by the policies underlying the exhaustion requirement." *Bowen v. City of N.Y.,* 476 U.S. 467, 484 (1986) (internal quotation marks and citation omitted); *see also Payne v. Peninsula Sch. Dist.,* 653 F.3d 863, 870 (9th Cir. 2011) ("determining what has and what has not been exhausted under the IDEA's procedures may prove an inexact science"; "the exhaustion requirement appears more flexible than a rigid jurisdictional limitation—questions about whether administrative proceedings would be futile, or whether dismissal of a suit would be consistent with the general purposes of exhaustion, are better addressed through a fact-specific assessment of

---

[47] On a related point, the Court does conclude that Defendant's delay in raising the administrative exhaustion requirement constitutes a waiver of any argument Defendant might make that, if Plaintiffs' IDEA claims were to be dismissed for failure to exhaust, the Court should not exercise supplemental jurisdiction over Plaintiffs' related state law breach of contract claims. With regard to this issue, Defendant's delay would have been prejudicial to Plaintiffs. *See Malinger v. U.S. Swimming, Inc.,* 435 Fed. App'x 559, 562 (7th Cir. 2011) (unpublished) (vacating district court order remanding state law claims to state court where "the litigants and the district court have expended considerable time and resources—19 months from removal to summary judgment—completing discovery and developing a full record to litigate all of [the plaintiff's] claims, including the state claims").

the affirmative defense"), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014).

This case involves a situation where Plaintiffs already participated in the administrative process once, having exhausted their administrative remedies before filing the first lawsuit. The Settlement Agreement was the final result of those earlier administrative proceedings. Defendant correctly points out that the issues now before this Court were never raised in those administrative proceedings, and, ordinarily, it would not be proper to allow a party to piggy-back on an earlier administrative exhaustion that did not address the claims currently at issue. But Plaintiffs make the equally valid point that this case is merely a continuation of the previous lawsuit in which they seek only to vindicate the rights they believe they obtained from their already exhausted claims, which rights include an agreement voluntarily entered into by Defendant to undertake obligations related to a matter that was not previously explored in the administrative proceedings. While Judge Holderman held in his mootness ruling that those issues needed to be addressed administratively, the first lawsuit did not end at Judge Holderman's mootness ruling. Instead, the parties negotiated further and ultimately reached an agreement whereby John's parents gave up viable claims for compensatory education and attorneys' fees in exchange for Defendant's promise to provide the agreed-to educational program with the specific goal of avoiding the need for further time-consuming and costly administrative and possibly judicial proceedings in the final 26 months of John's secondary school education.

"While a challenge to the contents of an IEP would require exhaustion of administrative remedies—since school administrators are in the best position to establish appropriate educational programs—exhaustion of administrative remedies when a plaintiff is challenging only a failure to implement an IEP would prove fruitless." *John G. v. Ne. Educ. Intermediate Unit 19*, 490 F. Supp. 2d 565, 579 (M.D. Pa. 2007). Plaintiffs contend that a transition plan for John already had been agreed to by the parties, and that, when Smith took over as Director of Special Education, she simply ignored that agreement. Defendant argues at length that the record does not support Plaintiffs' contention that the agreed-to transition plan included community college. But clearly that question is a disputed issue of fact. Questions concerning the terms of an agreed transition plan, whether Defendant implemented it properly, and, if it did not, what the remedy under IDEA for that failure should be, may not be subject to administrative exhaustion. *See, e.g., W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir. 1995) (holding that exhaustion was excused in part because a factual record already had been developed in the numerous prior administrative proceedings to determine the child's classification and placement, and "an action seeking compensation for the alleged IDEA violations is now ripe for judicial resolution"), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 792 (3d Cir. 2007); *Lester H. v. Gilhool*, 916 F.2d 865, 869-70 (3d Cir. 1990) (holding that exhaustion was futile for claim seeking compensatory education when parties stipulated that profoundly retarded child's in-home IEP was inappropriate and where school nonetheless took approximately 2 1/2 years to locate

an appropriate program for the child); *cf. Robinson v. Pinderhughes*, 810 F.2d 1270, 1272 (4th Cir. 1987) (no further exhaustion required where plaintiffs challenged school district's failure to implement hearing officer's decision in favor of plaintiffs, which failure gives rise to § 1983 claim against school district for violation of the IDEA).

In addition, Plaintiffs argue that whether Defendant validly terminated John's placement because of a non-IDEA attendance policy or practice also presents a question for which administrative exhaustion is not required. Defendant responds that even if it terminated John's IDEA program based on a non-IDEA policy, Plaintiffs had a remedy under the IDEA for that termination, and therefore exhaustion was required.[48] That is not necessarily so, however. *See Banks ex rel. Banks. v. Modesto City Schs. Dist.*, 2005 WL 2233213, at *8 (E.D. Cal. Sept. 9, 2005) (claim of wrongful suspension falls outside scope of IDEA and therefore exhaustion not required). Moreover, even accepting Defendant's argument, Plaintiffs contend that Defendant's policy allowing for termination of a special education placement based on a non-special education attendance policy violates federal law. In addition, Plaintiffs argue, Defendant should have called an IEP meeting before "unilaterally" terminating John's aides and supports that were being provided by Orchard, as well as before "unilaterally" terminating John's program at Orchard and then

---

[48] Defendant wants to have its cake and eat it too. It argues that it did not need to follow the IDEA procedure of calling an IEP meeting to terminate John's enrollment because that termination was based on a school policy unrelated to special education. At the same time, it argues that *Plaintiffs* had to follow the IDEA, including its administrative exhaustion requirement, if they wanted to challenge Defendant's termination for non-special education reasons. *See* R. 75 at 7.

disenrolling him from the school district. Plaintiffs argue that the law does not allow a school district to simply "divest itself" of a student in the manner in which Defendant did here. These issues are not the kind that normally require administrative exhaustion. *See, e.g., Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002) (exhaustion is not necessary where "an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law").

Finally, Plaintiffs have raised a valid argument that this is one of those unique cases where administrative exhaustion would be futile because of the retrospective nature of Plaintiffs' claims. John's eligibility for special education services has since passed, and therefore his educational injuries "are wholly in the past." *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000) (holding that "state's administrative process would be futile and is not required before the plaintiff can file suit in federal court" where "the injured child has already graduated from the special education school").

It is true, as Defendant argues, that the Seventh Circuit has said that "characterizing the claim as one for 'retrospective injuries'" is "insufficient" "because the timing for seeking relief is largely up to parents—they cannot sit on claims and later sue for damages." *C.T. ex rel. Trevorrow v. Necedah Area Sch. Dist.*, 39 Fed. App'x 420, 423 (7th Cir. 2002) (unpublished); *see also McCormick v. Waukegan Sch. Dist. No. 60,* 374 F.3d 564, 568 n.1 (7th Cir. 2004) ("the need to exhaust should not depend upon the extent of delay in litigation or the choice of a plaintiff to delay

litigation until he or she graduates"). But this case does not involve a situation where the parents simply sat on their claims and later sued for damages. Instead, John's parents reasonably believed they had reached an agreement to resolve all of their son's future educational needs without the time, expense, and delay of more administrative proceedings. Indeed, they released Defendant from viable claims for compensatory education and attorneys' fees to secure that result. They continued to believe the agreement they had reached governed the parties' relationship even while disputes over its terms erupted. The Court has held that they did not have to exhaust their claims for breach of the Settlement Agreement. But if it turns out in retrospect that the portion of the Settlement Agreement on which Plaintiffs have been relying is unenforceable because there was no meeting of the minds, then it is now too late for Plaintiffs to go back and exhaust their administrative remedies for a claim under the IDEA based on the terms they thought they had secured by the Settlement Agreement. To protect against this result, Plaintiffs would have had to engage in the very process they had bargained to avoid thereby defeating one of the purposes of entering into the settlement. Plaintiffs' IDEA claims and Plaintiffs' claims based on the Settlement Agreement (which do not have to be exhausted) overlap. Requiring exhaustion for the IDEA claims would not serve any purpose other than to punish Plaintiffs for their good faith belief that they did not need to exhaust their administrative remedies because they had negotiated a settlement agreement to stand in place of exhaustion. Exhaustion should not be used to prevent potentially valid claims from being heard when it only becomes clear that Plaintiffs

should have exhausted their administrative remedies at a point in time when administrative remedies are no longer available. In such circumstances, administrative remedies are futile and foreclosing Plaintiffs' claims based on the exhaustion doctrine would serve to encourage school districts to ignore their obligations under settlement agreements in hopes of avoiding those obligations altogether.

For the foregoing reasons, the Court concludes that there a number of reasons why administrative exhaustion might be excused as being futile for at least some if not all of Plaintiffs' IDEA claims. Because Plaintiffs' IDEA claims are not at this point clearly defined as distinct from Plaintiffs' claims for breach of the Settlement Agreement, the Court will reserve a final ruling on the issue until Plaintiffs' specific claims under the IDEA unfold and the Court can more precisely determine whether any of the reasons given above for excusing exhaustion should be applied.

### 2. WHETHER DEFENDANT DENIED JOHN A FAPE

The current record also does not lend itself to resolution on summary judgment of Plaintiffs' claims for violation of the IDEA, and, indeed, the Court is not entirely certain, divorced from the Settlement Agreement, what those claims are. It appears that Plaintiffs are raising both procedural[49] and substantive[50] arguments

---

[49] *See Bd. of Educ. of Twp. High Sch. Dist. No. 211*, 486 F.3d at 276 ("'Procedural flaws do not automatically require a finding of a denial of a [free appropriate public education]. However, procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a [free appropriate public education].'") (quoting *Heather S. v. State of Wis.*, 125 F.3d 1045, 1059 (7th Cir. 1997) (internal quotation marks and citation omitted)).

for why John was denied a FAPE (1) during the 2010-2011 school year, while he attended the Orchard program, and (2) beginning in the fall of 2011, when Plaintiffs made a private placement decision to enroll John in ELSA.

When a parent believes that the state has failed to offer his or her child a FAPE, the parent may unilaterally place the child in a private school and seek reimbursement from the school district. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009). "The U.S. Supreme Court has established a three-step reimbursement test. Under this *Burlington–Carter* test, [Defendant] is required to pay for the private school tuition only if: (1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parents chose was appropriate; and (3) the equitable factors weigh in favor of reimbursement." *FB v. N.Y. City Dep't of Educ.*, 132 F. Supp. 3d 522, 534-35 (S.D.N.Y. 2015) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12-16 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373-74 (1985)); *see generally Bd. of Educ. of Evanston-Skokie Cmty. Consol. Sch. Dist. 65 v. Risen*, 2013 WL 3224439, at *22 (N.D. Ill. June 25, 2013).

It seems likely that John was denied a FAPE in the 2011-2012 academic year because the record does not show Defendant as having offered *any* educational

---

[50] *See Bd. of Educ. of Hendricks Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982) (a state offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction"); *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 613 (7th Cir. 2004) (in order to meet the substantive criterion for validity, "an IEP must respond to all significant facets of the student's disability, both academic and behavioral") (citing *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 642 (8th Cir. 2003)).

program to him in this time period. There also appears to be a serious question whether Plaintiffs' procedural rights were violated by Defendant's termination of John's placement at Orchard without following the proper procedures for making a change to an educational placement. To the extent that Defendant relies on an attendance practice or policy to avoid the procedural requirements of the IDEA, that argument will not suffice. Defendant knew that John's lack of attendance was due to his parents' assertion of their IDEA rights. Thus, the IDEA applies. Nevertheless, the parties have not sufficiently addressed all of the pertinent issues related to Plaintiffs' IDEA claims, including the applicable procedural requirements for changing or terminating a placement, notice requirements and whether they can be waived, and appropriate remedies. The Court therefore cannot determine from the summary judgment filings whether a statutory violation occurred, and if so, whether Plaintiffs are entitled to the remedies they seek (which potentially include recovery for the costs of a unilateral educational placement, compensatory education, and attorneys' fees). Accordingly, the Court declines to decide any of these issues at this time.

### D. EQUITABLE ISSUES—FAILURE TO COOPERATE, ESTOPPEL, AND UNCLEAN HANDS

Defendant's final summary judgment argument is that Plaintiffs should be barred from recovering on their claims because of parental noncooperation. Defendant's noncooperation argument is essentially the mirror image of Plaintiffs' argument that equitable principles such as estoppel and unclean hands bar Defendant from raising administrative exhaustion as a defense. The Court already

has found that administrative exhaustion is either not required or may be excused in this case. Therefore, the Court will not specifically address Plaintiffs' unclean hands and estoppel arguments, but instead will focus on the noncooperation issue.

First, the Court rejects Defendant's argument that John's parents "'deliberately prevent[ed] the fulfillment of a condition on which [Defendant's] liability under [the Settlement Agreement] depend[ed].'" R. 55 at 18 (quoting *Yale Dev. Co. v. Oak Park Trust & Sav. Bank*, 325 N.E.2d 418, 422 (Ill. App. 1975)). Defendant cites this principle of law to argue that Plaintiffs' enrollment of John in community college classes prevented Defendant from delivering John the agreed-to program at Orchard. This contract law principle, however, has no application to the facts of this case. No provision of the Settlement Agreement prohibits Plaintiffs from enrolling John in community college classes. Moreover, Plaintiffs' claim is that Defendant breached the Settlement Agreement and failed to provide a FAPE because Defendant terminated Orchard's aides and supports for John's Oakton classes. Defendant's ability to provide the Orchard aides and supports for community college classes did not depend on anything Plaintiffs failed to do. Defendant's noncooperation argument that it could not provide John with other educational services through the Orchard program because of his absences simply is not responsive to Plaintiffs' claim.

Second, Defendant's argument that John's parents are to blame for Defendant's refusal to pay for the ELSA placement because they failed to notify Defendant when John applied to PACE or when John got rejected by PACE, also is

without merit. The Settlement Agreement does not contain any provision requiring such notification, and Defendant has not presented any argument for why John's parents' failure to provide notification constitutes a basis for voiding Defendant's contractual obligations under the Agreement. Nor does Defendant explain how the failure to receive the notice in question rendered Defendant "incapable of complying with the Agreement" (R. 55 at 27) regarding the PACE placement. The only issue regarding the PACE placement is whether Defendant is obligated to pay for the replacement program (ELSA), when the parties never met to discuss a new program after PACE rejected John's application. Defendant admits that it knew of PACE's rejection, but argues that it did not fulfill the PACE placement requirement of the Settlement Agreement because by then John already had been terminated and disenrolled "so the District had no further duty to attempt to call an IEP meeting." R. 55 at 26 n.5. Thus, by Defendant's own admission, the PACE/ELSA question is whether Defendant had any "duty," not whether Defendant was prevented by Plaintiffs from fulfilling that duty, which is the issue that Defendant's noncooperation argument addresses. Therefore, Defendant's failure to cooperate argument as to Plaintiffs' PACE/ELSA claim also fails.

Third, Defendant's noncooperation argument also fails as to Plaintiffs' IDEA claims. Defendant's obligation under the IDEA to provide educational services to John exists independently of John's parents. *See* 20 U.S.C. § 1412(1) (a FAPE must be made available "to *all* children with disabilities") (emphasis added); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) ("[P]ublic educational

authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is the IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims."); *see also Moore v. Hamilton Se. Sch. Dist.*, 2013 WL 4607228, at *17 (S.D. Ind. Aug. 29, 2013) (a school district's "obligation to provide a FAPE to a student is not excused by parental opposition to any particular plan"). Therefore, Defendant cannot defend its decision to terminate John's placement and school enrollment by pointing to the difficulties John's parents caused it in performing its duties. Nor can Defendant defend its failure to offer any educational program to John beginning in the fall of 2011 on parental noncooperation. Regardless of its views about the meet-to-discuss provision of the Settlement Agreement, Defendant had an independent and concurrent obligation under the IDEA to offer John a FAPE in John's final two years of IDEA-eligibility. There is no evidence in the record that it did so.

The case law cited by Defendant is factually distinguishable. In *Pedraza v. Alameda Unified School District*, 2011 WL 4507111 (N.D. Cal. Sept. 29, 2011), the school district admitted it had agreed to provide the services that it failed to provide. It argued, however, that it attempted to provide those services but was prevented from doing so because the parents "refused to participate in the process and to provide the necessary information so that the services could be provided." *Id.* at *10. Here, John's parents did not prevent Defendant from providing the disputed

services in question, namely the aides and supports for Oakton community college classes. An argument that John's parents' lack of cooperation prevented Defendant from providing *other* services that Orchard was willing to provide is simply not a defense to the claim Plaintiffs have raised.

Defendant also cites *Patricia P. v. Board of Education of Oak Park*, 203 F.3d 462 (7th Cir. 2000). But in that case, the *parent* "unilaterally removed" the child from the school district and, once removed, did not send him back for evaluation. *Id.* at 469. Here, *Defendant* unilaterally removed John from the school district by disenrolling him. While there is some testimony by Bobrowski that John's absences from Orchard were making it difficult for Orchard to complete the agreed-to assessments for purposes of John's 2009-2010 IEP, difficulties are not the equivalent of completely removing the child from the school district. Nor would those difficulties justify Defendant in disenrolling John from the school district and failing to offer John a FAPE for the school years following the 2009-2010 academic year. The Seventh Circuit held in *Patricia P.* that "parents who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placement." *Id.* But Defendant does not argue here that the reason it failed to offer John any educational placement beginning in the fall of 2011 is that it did not have "a reasonable opportunity to evaluate" John as a result of John's parents' conduct. Instead, Defendant's argument is that it did not offer a FAPE to John beginning in 2011 because it believed it had no duty to offer him educational

services after March 15, 2010 due to his disenrollment by Defendant for nonattendance and his parent's failure to seek reenrollment.

The Court is particularly skeptical of Defendant's noncooperation argument as applied to the ELSA placement. Defendant argues that it was relieved of its duties under the IDEA for providing John a FAPE beginning in the school year following John's Orchard placement because Defendant disenrolled John from the school district and John's parents failed to cooperate by not seeking reenrollment. But the stated reason for Defendant's disenrollment was John's absences from the Orchard program, and John's absences were the result of John's parents' assertion of their rights under the IDEA to have John attend community college classes as part of that placement. If the Court were to accept that argument, John would be denied a FAPE in the following school years because his parents asserted their rights under the IDEA in the previous school year. Even apart from whether a disabled student can ever be deprived completely of his right to a FAPE based on his parents advocating on his behalf for specific services to be provided as part of that FAPE, it would be improper for the Court to rely on John's parents' conduct regarding the Orchard placement to justify denial of a FAPE to John in the years following that placement. Under Defendant's theory, Defendant could essentially breach its duty to provide John with a FAPE for his last fourteen months of IDEA eligibility without consequence based on alleged noncooperation by John's parents during the previous school year. "This result would undermine the IDEA's central purpose of ensuring that *all* children with disabilities receive a FAPE. A child

should not lose the IDEA's protections any time a school district might have grounds to second-guess the parents' earlier placement decisions. Otherwise, one mistake years earlier could result in a child forever being left behind." *Bd. of Educ. of Evanston-Skokie Cmty. Consol. Sch. Dist. 65*, 2013 WL 3224439, at *23 (emphasis in original). These concerns are especially acute in a case like this where the alleged noncooperation of John's parents involved a good faith belief that they had a legal right to insist on enrolling John in community college classes.

Moreover, Defendant ignores the Seventh Circuit's further comment in *Patricia P.* that "a school district is [ ] *also* bound by the IDEA's preference for a cooperative placement process: this Court will look harshly upon *any* party's failure to reasonably cooperate with another's diligent execution of their rights and obligations under the IDEA." *Patricia P.,* 203 F.3d at 469 (emphasis added); *see also W.L.G.,* 975 F. Supp. at 1329 ("While parents such as Riley, who are obviously concerned and active in securing their child's education, are to be encouraged to pursue the remedies specified in the IDEA, they are, foremost, encouraged to work in partnership with local school districts, where they will most likely find caring partners. Where that is not the case, or where attempts at cooperation fail and compromise a child's opportunities, they should certainly seek the full range of remedies available to them."). There is at least a disputed issue of fact whether *Defendant* failed to "reasonably cooperate" with John's parents' "diligent execution of their rights and obligations under the IDEA."

The history of this case reveals that, notwithstanding (or perhaps, as a result of) the parents' filing of a request for a due process hearing and subsequent court litigation, the parties worked hard over the course of John's first four years of high school to maintain the collaborative process required by the IDEA. Their hard work appeared to culminate with the Settlement Agreement. Yet shortly after the Settlement Agreement was signed, the collaborative process broke down and the relationship deteriorated from there. All of the reasons for this may not be apparent from the current record. But it seems to the Court that the problem began when one of the first things Smith did after taking over as Director of Special Education was to direct Orchard Academy to discontinue aides and supports it had been providing to John without engaging in a discussion with the parents first. The Court recognizes that Defendant believes Smith was justified in taking the actions she did because she was only "restoring" John's original agreed-to program after Christine Miksis "unilaterally" enrolled John in community college classes. But this argument ignores the fact that the de facto status quo, for whatever reason, was that John was receiving those supports and services.

From Defendant's perspective, it may have been "restoring" the agreement, but to Plaintiffs, Defendant was changing it; only a compromise or a third party decision could resolve who was right on that issue. Moreover, there is one crucial difference between what Smith did and what John's parents did: Smith knew at the time she took her action that the parents disputed her view of what the agreement was, whereas, at the time Christine Miksis took the complained of actions, she

appeared to have a good faith belief that the parties had reached an agreement that supported her actions.[51]

Smith testified that she consulted with her attorney before making the determination that the Settlement Agreement did not cover the aides and supports Orchard was providing. But for the collaborative process to work, she should have consulted not just with her attorney but with the parents, and done so before she had made up her mind as to who was correct regarding what the Settlement Agreement provided. *See Bd. of Educ. Of Twp. High Sch. Dist. No. 211,* 486 F.3d at 274 ("The parents claim that the meetings that the District held . . . were nothing but an elaborate effort to ratify a decision that the District had already made without their input. If this were true, then it would violate the IDEA."). Had Smith done so, she perhaps would have understood better why Christine Miksis believed the community college classes were part of the agreement. Even if Smith still disagreed with John's parents after having that discussion, a better understanding of their position could have led to a compromise solution that avoided this litigation.

---

[51] It certainly is possible that Christine was being calculating in that she knew Defendant had not accepted the community college proposal when she communicated with Orchard Academy prior to the start of John's program. But it also seems improbable. Nothing in Christine's communications suggests that she had anything other than a good faith belief that the parties' agreement was as she described. Moreover, Defendant's attempt to infer bad faith from the fact that Christine did not copy Defendant on her communications with Orchard is weak; as Christine testified, Orchard was delivering John's educational program on behalf of Defendant, so she reasonably may not have thought she needed to copy Defendant. In addition, it seems highly doubtful that Christine's actions were designed to be "clandestine," as Defendant suggests (R. 75 at 19 n.9), because it would be expected that Orchard would communicate with Defendant at some point, and then her so-called "deceitful conduct" would be discovered (which of course it was).

That is what the collaborative process is all about. What Smith did instead was fundamentally not "collaborative."

In the end, Defendant's arguments regarding the parents' noncooperation depend entirely on Defendant's view of the parties' contractual obligations being correct when clearly there was a good faith dispute over what those contractual obligations were. Given that a good faith dispute existed, Defendant could not simply declare what the agreement was without violating John's parents' procedural rights to a collaborative decision-making process. But what is perhaps even more puzzling to the Court is that Defendant disregarded the contractual aspect of the dispute. That is, Plaintiffs had a contractual right to what was promised in the Settlement Agreement independent of their rights under the IDEA. If that were not the case, it would have been pointless for Plaintiffs to have entered into the Settlement Agreement; whatever rights they had under the IDEA for John's education going forward existed before the settlement and would continue to exist after the settlement, making the Settlement Agreement superfluous. Not only that, but they would have gained nothing when they gave up their right to claim damages and attorneys' fees for Defendant's past violations.

This discussion is not to decide the substantive issue of whether Smith had the legal or statutory right to do what she did; it is rather to expose the logical flaw in Defendant's noncooperation argument. All of the conduct that supposedly constituted noncooperation by John's parents can only be viewed as noncooperation if Defendant is correct on the merits issues yet to be decided by the Court. On the

one hand, if the Court were to rule in favor of the parents, then their conduct cannot be characterized as "noncooperation"; on the other hand, if the Court were to rule in favor of Defendant, then Defendant would not need a noncooperation defense to Plaintiffs' claims. In short, the parents' cooperation or lack thereof is irrelevant to the issues in this case. But Defendant having raised the issue, it is the Court's view that the facts do not show noncooperation by Plaintiffs. Instead, the record shows that Plaintiffs acted according to a good faith belief, whether right or wrong, as to their contractual and statutory rights, while Defendant disregarded the possibility that Plaintiffs' could be correct about their contractual rights and also disregarded its duty under the IDEA to collaborate with Plaintiffs before making any decisions concerning John's educational placement. *See, e.g., Bd. of Educ. of Evanston-Skokie Cmty. Consol. Sch. Dist. 65,* 2013 WL 3224439, at *24-25 ("There is considerable evidence in the record to support the hearing officer's conclusion that L.J.'s parents cooperated. Indeed, the District's continued pursuit of this theory borders on the frivolous. . . . There is no basis to deny reimbursement for lack of cooperation . . . . If anything, L.J.'s parents exhibited extraordinary patience in dealing with the District.").

## CONCLUSION

In accordance with the terms and conditions set forth above and as previously ordered, R. 81, Plaintiffs' motion for summary judgment, R. 49, and Defendant's cross-motion for summary judgment, R. 51, are denied. A status hearing is set for February 15, 2017 at 9:00 a.m. Neither party has made a jury

demand, so the parties should be prepared to discuss at the status an appropriate date for a bench trial.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: February 2, 2017